MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:        2020 ME 91
Docket:          Aro-19-203
Submitted
  On Briefs:     April 14, 2020
Decided:         June 18, 2020

Panel:        MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.
Majority:     MEAD, GORMAN, HUMPHREY, and HORTON, JJ.
Concurrence:  CONNORS and JABAR, JJ.

## STATE OF MAINE

v.

## WAI CHAN

HORTON, J.

[¶1]  Wai Chan appeals from a judgment of conviction entered by the trial court (Aroostook County, *Stewart, J.*) after a jury found him guilty of burglary (Class B), 17-A M.R.S. § 401(1)(B)(4) (2020), and theft by unauthorized taking or transfer (Class C), 17-A M.R.S. § 353(1)(B)(4) (2020).  He argues that the trial court erred when it denied his motion to suppress portions of a surveillance video recording, where other portions of the recording were not preserved.  He also contends that although he did not object, the court committed obvious error by failing to intervene after several of the prosecutor's comments made during the State's closing argument.  We affirm the judgment.

## I. BACKGROUND

[¶2] Viewing the evidence admitted at trial in the light most favorable to the State, the jury could have found the following facts beyond a reasonable doubt. *See State v. Bethea*, 2019 ME 169, ¶ 2, 221 A.3d 563. During the afternoon of September 3, 2017, while the victims were at work, Chan drove to their home in Caribou. Although he knew that he was not licensed or privileged to do so, he entered the residence through the locked front door using a key that was hidden in an unlocked entryway. Once inside, he gathered some of the victims' property, including a laptop computer, an electric shaver, a backpack, and cash. He carried the property to his vehicle, placed it inside, and drove away. The value of the property exceeded $1,000.

[¶3] Chan was familiar with the victims and their work schedules, as well as the residence and the location of the hidden key, because he had previously lived with the victims at the residence and worked with them at a restaurant. He had also helped one of the victims pick out the laptop computer and had accompanied the victim to the store to purchase it. About two weeks before the burglary and theft occurred, he had ended his employment at the restaurant and moved out of the residence.

[¶4]  By complaint, and then by indictment, the State charged Chan with one count of burglary (Class B), 17-A M.R.S. § 401(1)(B)(4), and one count of theft (Class B), 17-A M.R.S. § 353(1)(B)(1) (2020).  After Chan pleaded not guilty to both charges, he moved to suppress two surveillance video recordings that the police had obtained.  He argued that the recordings were excerpts from a longer recording and that the State's failure to preserve the full recording violated his due process rights.[1]  The court held a suppression hearing and then denied Chan's motion.

[¶5]  The court's order denying the motion included the following findings, which are supported by competent evidence in the suppression record.  *See State v. McNaughton*, 2017 ME 173, ¶ 10, 168 A.3d 807.  After the burglary and theft were reported to the police, an officer contacted a convenience store located across the road from the victims' home to inquire whether the store had surveillance footage of the area.  The store manager told the officer that the store did have a surveillance camera facing in the direction of the victims' home.  The officer asked the store manager to review the

---

[1]  Chan also contended that the failure to preserve the original recording deprived him of the ability to cross-examine a witness effectively and that that witness's identification was influenced by unduly suggestive procedures by the police.  He has not raised either of those arguments on appeal.

4

recordings for the day in question "from morning (8 a.m.) until dark" and "to look for anything unusual, or anyone coming and going at unusual times."

[¶6]  The store manager assigned the task to an employee, instructing the employee "to watch the video for the entire day, and to record . . . all times when someone was seen coming or going from the house across the street."[2]  The employee watched the video and identified three specific times for the store manager: first, 9:40 a.m., when people left the home; second, shortly after 2:00 p.m., when a person parked a car in the driveway and entered the home; and third, shortly after 4:00 p.m., when a person left the home, walked to the parked car while carrying things, and drove away.

[¶7]  The store manager placed two separate video clips onto a data storage device—one showing the activity around 2:00 p.m., and the other showing the activity around 4:00 p.m.—and provided the device to the officer. The officer did not ask anyone who worked at the store to preserve any recordings or to provide any additional recordings.  As the store's surveillance system accumulated new data, it automatically recorded over any data that had

---

[2] Neither Chan nor the State called this employee as a witness during the suppression hearing.

not been specifically preserved. At some point, all of the store's surveillance video data from September 3, 2017, was written over and lost.[3]

[¶8] Applying the legal standards we have set forth in, for example, *State v. Cote*, 2015 ME 78, ¶ 15, 118 A.3d 805, the court concluded that the State's failure to obtain or preserve other portions of the store's surveillance video recordings did not constitute a violation of Chan's due process rights. In reaching its conclusion, the court found that Chan had not met his burden to demonstrate either (1) that it was apparent that any unpreserved portions of the recordings had exculpatory value, or (2) that the State acted in bad faith in failing to preserve the remainder of the store's recording from the day in question.

[¶9] The court held a two-day jury trial in April 2019. Among other instructions that it gave before closing arguments, the court instructed the jury that statements by the attorneys, including closing arguments, were not evidence. The court also explained the presumption of innocence and the

---

[3] The evidence suggests that this occurred before Chan submitted a more particularized discovery request to the State pursuant to M.R.U. Crim. P. 16(b)(7), (c).

6

State's burden of proof beyond a reasonable doubt, and instructed the jury that Chan had no burden to present any evidence or to prove anything.[4]

[¶10]   During Chan's closing argument, he suggested that he was a scapegoat and that someone else who worked at the restaurant must have known about and stolen the money.  In response, during the State's rebuttal closing argument, the prosecutor suggested that Chan's theories were inconsistent with the evidence that had been admitted and commented on the lack of evidence to support them.  Chan did not object to any part of the State's closing argument.

[¶11]  The jury returned guilty verdicts on the burglary and theft counts, and found that the value of the stolen property was more than $1,000 but not more than $10,000.[5]  The court sentenced Chan to three years in prison on the burglary count, and two years in prison, concurrent, on the theft count.[6]  The court also imposed $1,000 in restitution for the benefit of the victims and $70 in

---

[4] Chan did not request an instruction on spoliation of evidence related to the unpreserved video recording.  *Cf. State v. St. Louis*, 2008 ME 101, ¶¶ 3, 5, 951 A.2d 80.

[5] The theft conviction was therefore for a Class C offense, *see* 17-A M.R.S. § 353(1)(B)(4) (2020), instead of a Class B offense, *see* 17-A M.R.S. § 353(1)(B)(1) (2020), as the State had alleged.

[6]  The judgment indicates that Chan received credit for time served, which, by the time of sentencing, was about eighteen months.

surcharges.  The court entered a judgment on the verdict.  Chan timely appeals.[7]

*See* 15 M.R.S. § 2115 (2020); M.R. App. P. 2B(b)(1).

## II.  DISCUSSION

[¶12]  Chan argues that the trial court erred when it denied his motion to suppress the preserved surveillance recordings, and that the prosecutor's comments during the State's closing argument constituted misconduct requiring a new trial.  We address his arguments in turn.

### A.    Unpreserved Evidence

[¶13]  When reviewing the denial of a motion to suppress evidence, we review the trial court's factual findings for clear error and its legal conclusions de novo.  *Cote*, 2015 ME 78, ¶ 9, 118 A.3d 805.  We "will uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision."  *State v. Diana*, 2014 ME 45, ¶ 11, 89 A.3d 132 (quotation marks omitted).

[¶14]  In *Cote*, we discussed and clarified the legal framework that applies when a defendant contends that his constitutional right to a fair trial was violated by the State's failure to preserve certain evidence.  2015 ME 78, ¶¶ 9-15, 118 A.3d 805.  We explained that the inquiry requires the trial court

---

[7] The Sentence Review Panel denied Chan's application for leave to appeal from his sentence.  *See* M.R. App. P. 20; *State v. Chan*, No. SRP-19-222 (Me. Sent. Rev. Panel Sept. 10, 2019).

"to conduct a bifurcated analysis." *Id.* ¶ 15. "First, the court must determine whether the evidence possessed 'an exculpatory value that was apparent before the evidence was destroyed.'" *Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)). "If so, then the defendant must show only that the evidence was 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Id.* (quoting *Trombetta*, 467 U.S. at 489). "If, however, the exculpatory value of the evidence was not apparent at the time of its loss or disappearance, the defendant cannot establish a constitutional deprivation without proof that the State also acted in bad faith in failing to preserve the evidence." *Id.* (citing *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988)); *see Youngblood*, 488 U.S. at 58 ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially useful* evidence does not constitute a denial of due process of law." (emphasis added)).

[¶15]  We note at the outset that the cases applying this analysis have examined the government's failure to preserve evidence that, for at least some period of time, had come within its possession or control. *See Youngblood*, 488 U.S. at 52-54, 57; *Trombetta*, 467 U.S. at 481-83, 487-88, 488 n.7; *see also, e.g., Cote*, 2015 ME 78, ¶ 4, 118 A.3d 805; *State v. Cruthirds*, 2014 ME 86, ¶ 27,

96 A.3d 80; *State v. St. Louis*, 2008 ME 101, ¶ 3, 951 A.2d 80. When presented with allegations that the government failed to disclose information, we have made clear that the due process clause does not require the State "to search for information the State *does not know exists* and that is not within its control." *State v. Hassan*, 2018 ME 22, ¶ 19, 179 A.3d 898 (emphasis added). Absent at least some reason to know that the evidence exists, it would be impossible for the State to preserve the evidence in the first place or to disclose it later. *See id.* ¶ 22 ("An allegation that prosecutors have failed to turn over information that they do not actually or constructively possess or control . . . can never serve as the basis for a *Brady* violation.");[8] *see also Strickler v. Greene*, 527 U.S. 263, 280-81 (1999).

[¶16] We do not depart from those rules here. In this case, however, the trial court, by applying the standards we expressed in *Cote*, implicitly found that the unpreserved portions of the store's surveillance video recordings for the day in question were within the knowledge and at least the constructive control of the investigating officer, and therefore of the State, before they were destroyed. In the particular circumstances of this case, that finding was

---

[8] In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court established that a due process violation occurs when the government fails to disclose evidence that is "favorable to an accused" and "material either to guilt or to punishment."

supported by the suppression record. The evidence suggested that the officer was informed that the store had a recording that covered the entire time period during which the victims claimed they had been away from their residence on the day of the alleged burglary, and that the officer could easily have obtained that entire recording. In addition, all of the store employees' investigatory conduct was performed at the direction of, and in consultation with, the police.

[¶17] Contrary to the State's contention, this case is unlike *Hassan*; there, the State had no reason to suspect that the evidence in question existed until a potential witness told the prosecutor new information shortly before trial.[9] 2018 ME 22, ¶¶ 3-4, 19, 179 A.3d 898. It *is* like *Trombetta*, where the government had "[t]he capacity to preserve" the breath samples at issue, 467 U.S. at 488 n.7. Although the police have no constitutional duty to pursue any particular course of investigation, *see State v. Robbins*, 1997 ME 21, ¶ 7, 689 A.2d 603, once the officer here became aware of the nature of the available recording, it became material over which the State could have obtained

---

[9] We are similarly unpersuaded by the State's attempts to analogize this case to *State v. Robinson*, 2015 ME 77, 118 A.3d 242, and *State v. Robbins*, 1997 ME 21, 689 A.2d 603, neither of which involved a due process challenge based on unpreserved evidence. In *Robinson*, we held that the trial court did not abuse its discretion when it allowed testimony about a video recording where the State did not know that the recording existed until after it had been destroyed. 2015 ME 77, ¶¶ 9-13, 22-36, 118 A.3d 242. In *Robbins*, a case that did not involve the loss or destruction of evidence at all, we held that the trial court did not err in permitting the rebuttal testimony of certain witnesses where the State was unaware of the existence of the witnesses until the end of the first day of trial. 1997 ME 21, ¶¶ 4-7, 689 A.2d 603.

possession or control, *cf. State v. Foy*, 662 A.2d 238, 242 (Me. 1995) (explaining that evidence that the State "had no reason to assume" existed "was not material that was, or should have been, in the [State's] possession or control").

[¶18] We therefore evaluate Chan's argument pursuant to the bifurcated analysis set forth in *Trombetta*, 467 U.S. at 489, and *Youngblood*, 488 U.S. at 58, as described in *Cote*, 2015 ME 78, ¶¶ 10-15, 118 A.3d 805.[10] As discussed above, *supra* ¶ 14, the first step in the analysis is for the court to "determine whether the evidence possessed 'an exculpatory value that was apparent

---

[10] We have unambiguously adopted the *Trombetta* and *Youngblood* standards when interpreting the Maine Constitution in this area of the law. *See State v. Anderson*, 1999 ME 18, ¶¶ 1, 7-12, 724 A.2d 1231 (applying the *Trombetta* and *Youngblood* standards to address a due process challenge pursuant to the Maine Constitution and reiterating that "[t]his Court has held repeatedly that due process under the Maine Constitution provides no greater protection to individuals than does due process under the United States Constitution"); *see also State v. Cote*, 2015 ME 78, ¶¶ 10-15, 118 A.3d 805; *State v. Bilynsky*, 2007 ME 107, ¶ 41, 932 A.2d 1169; *State v. Berkley*, 567 A.2d 915, 917-18 (Me. 1989).

Chan points out in a footnote in his brief that courts in other jurisdictions have interpreted their state constitutions to grant due process protection in this context beyond that defined in *Trombetta* and *Youngblood*, and invites us to do likewise, without explaining what in the Maine Constitution would be the basis for doing so. *See, e.g.*, *State v. Morales*, 657 A.2d 585, 590-95 (Conn. 1995) (collecting cases); *State v. Delisle*, 648 A.2d 632, 642-43 (Vt. 1994); *State v. Smagula*, 578 A.2d 1215, 1217 (N.H. 1990); *Commonwealth v. Olszewski*, 519 N.E.2d 587, 590 (Mass. 1988). We decline the invitation. *See, e.g.*, *State v. Lowe*, 2015 ME 124, ¶ 23 n.6, 124 A.3d 156; *State v. Genotti*, 601 A.2d 1013, 1021 (Conn. 1992) (declining to reach this precise issue absent "a separate state constitutional analysis alleging a violation of . . . state due process rights"); *cf. Morales*, 657 A.2d at 589 & n.10 (reaching the state constitutional law issue because the appellant had "furnish[ed] a detailed analysis" related specifically to the state constitution). As the Connecticut Supreme Court has stated, "reliance on other state constitutional precedent does not suffice as a proxy for independent analysis of our own constitutional language, history, tradition and policy." *State v. Perez*, 591 A.2d 119, 124 (Conn. 1991).

We do not foreclose the reassessment that Chan suggests, and that the concurrence also endorses, if the opportunity arises in a future case in which the issue is fully developed.

12

before the evidence was destroyed.'"  *Cote*, 2015 ME 78, ¶ 15, 118 A.3d 805

(quoting *Trombetta*, 467 U.S. at 489).

[¶19]   The  trial  court  found  that  the  evidence  was  not  apparently

exculpatory  when  it  was  destroyed,  and  that  finding  was  affirmatively

supported  by  the  suppression  record.   Chan  does  not  argue  otherwise—he

refers to the unpreserved recordings only as "potentially exculpatory."  In fact,

the record affords no reason to doubt that the employee who actually reviewed

the surveillance video noted all activity depicted, nor any reason to doubt that

the  manager  provided  everything  of  any  import  on  the  video  during  the

appropriate interval.[11]   No evidence admitted during the hearing indicated or

even  implied  that  the  unpreserved  portions  of  the  recording  had  any

exculpatory  value  at  all,  let  alone  that  that  fact  was  or  should  have  been

apparent to the police or the State.  *See id.* ¶¶ 17-18; *Cruthirds*, 2014 ME 86,

¶¶ 30-32, 96 A.3d 80.

[¶20]    Given  the  lack  of  apparently  exculpatory  evidence  in  the

unpreserved portion of the surveillance video recording, Chan bore the burden

---

[11] We are not persuaded by Chan's argument that "nobody ever watched some of" the recording. Based on the testimony that the store employee watched the recording of "the entire day" and "until it got dark," the court could have rationally found that the employee stopped watching when the recording became dark enough that she could not see the residence across the road. *See State v. Sasso*, 2016 ME 95, ¶ 19, 143 A.3d 124 (noting that absent a motion for further findings, "we infer that the court found all the facts necessary to support its judgment if those inferred findings are supportable by evidence in the record" (quotation marks omitted)).

of demonstrating that "the State . . . acted in bad faith in failing to preserve the evidence." *Cote*, 2015 ME 78, ¶ 15, 118 A.3d 805; *see Youngblood*, 488 U.S. at 58. The trial court found that he did not meet that burden, and we review that finding for clear error, *Cote*, 2015 ME 78, ¶ 19, 118 A.3d 805. The question of bad faith is a fact-specific inquiry focusing on the reasons behind the action or inaction leading to the claimed due process violation. *See, e.g.*, *Cruthirds*, 2014 ME 86, ¶ 32, 96 A.3d 80 (affirming a finding of no bad faith where police destroyed a sexual assault victim's clothing, given that the defendant had been positively identified by an eyewitness and "nothing beyond bare speculation pointed to an alternative suspect" when the clothing was destroyed). "[B]ad faith requires more than negligence." *Cote*, 2015 ME 78, ¶ 19 n.5, 118 A.3d 805; *see St. Louis*, 2008 ME 101, ¶ 7, 951 A.2d 80 (affirming a finding of no bad faith "despite the State's serious oversight" in allowing an insurance company to destroy a vehicle involved in an accident).

[¶21] Once the police became aware that the surveillance video depicted activity at the residence during the time in question, they could have obtained the recording for the entire day, rather than only the parts of the video that the store employee had picked out and the manager had provided. However, the failure to do so was negligent at worst. As the trial court found, no evidence

14

suggested that the State failed to preserve the remaining portions of the recording in order to conceal exculpatory evidence or to avoid discovery obligations. *See Cote*, 2015 ME 78, ¶ 19, 118 A.3d 805; *Cruthirds*, 2014 ME 86, ¶¶ 32-33, 96 A.3d 80; *see also Youngblood*, 488 U.S. at 58. That the officer did not personally watch the entire video, even accepting Chan's argument that he should have, does not indicate reckless or intentional conduct.[12] *See Cote*, 2015 ME 78, ¶ 19 & n.5, 118 A.3d 805. The trial court's finding that the State did not act in bad faith when it failed to preserve the remainder of the recording did not constitute clear error.

[¶22] We therefore decline to disturb the court's findings and conclude that the court did not err when it denied Chan's motion to suppress. *See Diana*, 2014 ME 45, ¶ 11, 89 A.3d 132.

B.     Prosecutorial Misconduct

[¶23] Chan argues that several of the prosecutor's statements during closing arguments constituted misconduct because they improperly suggested that he had a burden to present evidence in support of his theory of the case.[13]

---

[12] We therefore do not reach Chan's contention on appeal that *Youngblood*'s bad faith requirement could be satisfied by a showing of reckless disregard for the potentially exculpatory value of evidence that could have been obtained, preserved, and disclosed to the defense.

[13] He also argues that another statement made by the prosecutor was an improper appeal to the jurors' sympathies for the victims. We are not persuaded. In the context of the entire two-day trial, the prosecutor's reference to the victims' modest, hardworking lives, even viewed alongside other

Because he did not object to the statements during the trial, we review for obvious error.  *See* M.R.U. Crim. P. 52(b); *State v. Sousa*, 2019 ME 171, ¶ 15, 222 A.3d 171.  "To show obvious error, there must be (1) an error, (2) that is plain, and (3) that affects substantial rights."[14]  *Sousa*, 2019 ME 171, ¶ 15, 222 A.3d 171 (quotation marks omitted).  "[I]f these three conditions are met, we will set aside a jury's verdict only if we conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings." *Id.* (alteration in original) (quotation marks omitted).

[¶24]  We first review instances of alleged prosecutorial misconduct to determine whether misconduct occurred; if so, we then "review the State's comments as a whole, examining the incidents of misconduct both alone and taken together." *State v. Cheney*, 2012 ME 119, ¶ 34, 55 A.3d 473.  "When a prosecutor's statement is not sufficient to draw an objection, particularly when viewed in the overall context of the trial, that statement will rarely be found to have created a reasonable probability that it affected the outcome of the proceeding." *State v. Dolloff*, 2012 ME 130, ¶ 38, 58 A.3d 1032.

---

alleged improper statements, did not constitute misconduct requiring a new trial.  *See, e.g.*, *State v. Stanton*, 1998 ME 85, ¶¶ 11-13, 710 A.2d 240.

[14]  "To establish that the error affected a defendant's substantial rights, the defendant has a significant burden of demonstrating a reasonable probability that the prosecutor's statement affected the outcome of the proceeding."  *State v. Woodard*, 2013 ME 36, ¶ 33, 68 A.3d 1250 (alteration omitted) (quotation marks omitted).

[¶25] "Shifting the burden of proof to the defendant or suggesting that the defendant must present evidence in a criminal trial is improper closing argument." *Cheney*, 2012 ME 119, ¶ 34, 55 A.3d 473; *see Dolloff*, 2012 ME 130, ¶ 42, 58 A.3d 1032 (citing *United States v. Glover*, 558 F.3d 71, 76-79 (1st Cir. 2009)). A prosecutor is, however, "permitted to comment on the plausibility of the defendant's theory." *Glover*, 558 F.3d at 78. When the prosecutor does so, the "focus must be on the evidence itself and what the evidence shows or does not show, rather than on the defendant and what he or she has shown or failed to show." *Id.* In *Cheney*, for example, the prosecutor in closing argument first said that the defendant "d[id]n't have any evidence" to support his theory and then stated, "[T]hey desperately want you to believe that somebody else hit [the victim] . . . . Yet, they have no evidence of it." 2012 ME 119, ¶¶ 16-17, 55 A.3d 473 (third alteration in original) (quotation marks omitted). We decided that the argument was improper, noting that "it is essential that the State avoid making any statement suggesting that a criminal defendant has any burden to disprove the charges against him or her. The State is free, however, to forcefully argue to the jury that the evidence does not support or is not consistent with the defendant's theory of the case." *Id.* ¶ 35 (citation omitted).

[¶26]   Chan alleges four instances of improper burden-shifting by the prosecutor during the State's closing arguments.   First, referring to Chan's arrest, the prosecutor said:

> *[T]here is no evidence presented* that his car was packed full of money or had a computer.  *There is just no evidence on that.  Um, there is no evidence—there's been no testimony from somebody from Rhode Island that said this is what happened.*  You just have the fact that he was arrested, and there's kind of an absence of information other than that he was arrested in Rhode Island . . . .

(Emphasis added.)     Second, the prosecutor referred to Chan's alternative-suspect theory and said:

> The problem with that is you have to decide this case based on evidence, not on mere possibility.  And the idea that somebody could have done this, *well, where's the evidence?*  Who is this person? Who could these people be? . . . *[T]here's no evidence* about this unknown insider.

(Emphasis added.)  Third, the prosecutor asked, rhetorically:

> [A]re you saying [that Chan] hung out up here for two weeks before he went in and committed this crime?  *There is no evidence that he was up here for those two weeks.  There is just no evidence of that at all.*  And to say that, well, he couldn't have been up here, he had to have stayed here for two weeks, *there's no just no evidence to support that.*

(Emphasis added.)   Finally, responding to Chan's theory that others at the restaurant framed him because he was an "outsider" after leaving the restaurant, the prosecutor said:

> But *there was no evidence* that . . . Chan . . . had a giant falling out, that he had a fight with his boss, that there had been a violent disagreement, that he was fired*. There is no evidence* that would give rise to a feeling that the people at the restaurant . . . totally resented the fact that . . . he left.

(Emphasis added.)

[¶27]   Viewed "in the overall context of the trial," *State v. Sholes*, 2020 ME 35, ¶ 20, --- A.3d --- (quotation marks omitted), the first, third, and fourth statements did not rise to the level of misconduct because they were focused on the evidence that had been admitted, not on Chan's failure to present evidence of his innocence, *see Glover*, 558 F.3d at 76-79; *Sousa*, 2019 ME 171, ¶¶ 10-12, 222 A.3d 171 (concluding that a statement that there was "no evidence" that the defendant was experiencing delusions did not suggest that the defendant had a burden to present such evidence (quotation marks omitted)).

[¶28]   The prosecutor's second statement—in which he stated, "[T]he idea that somebody [else] could have done this, well, where's the evidence?"—was more problematic because it came closer to implying that Chan needed to present evidence to support his denial of culpability. *See United States v. Berroa*, 856 F.3d 141, 161-62 (1st Cir. 2017); *see also Glover*, 558 F.3d at 77; *United States v. Wihbey*, 75 F.3d 761, 770 (1st Cir. 1996) (referring to

"how-does-counsel-explain argument[s]" as "an impermissible shift of burden of proof" (quotation marks omitted)).

[¶29]  Regardless, the court's failure to intervene immediately did not constitute obvious error.  *See* M.R.U. Crim. P. 52(b); *Sousa*, 2019 ME 171, ¶ 15, 222 A.3d 171.  In this case, the court had amply instructed the jury that Chan had no burden whatsoever, stating that "[t]he law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence" and that "the burden of proof in this case is entirely upon the State.  The defendant does not have to prove anything.  The defendant does not have to produce any evidence. . . . The burden never shifts from the State to the defendant."  The court also instructed the jury that statements by the attorneys were not evidence.  These instructions more than sufficed to clarify any misimpression that the prosecutor's comments may have created.

The entry is:

Judgment affirmed.

_____

20

CONNORS, J., with whom JABAR, J., joins, concurring.

[¶30]  I agree with the Court's conclusion that Chan's conviction should be affirmed.  His due process rights were not violated, and he received a fair trial.  I write separately to express two brief, but important, caveats.

[¶31]  First, I believe it is important for us to acknowledge that the due process standards enunciated several decades ago by the United States Supreme Court in *Arizona v. Youngblood*, 488 U.S. 51 (1988)—and, to some extent, in *California v. Trombetta*, 467 U.S. 479 (1984)—have been the subject of considerable criticism.  Legal scholars have described these standards as placing too much emphasis on deterring official misconduct when evidence is lost or destroyed and not enough on ensuring fair and "reliable fact finding that protects the innocent from wrongful conviction."  Norman C. Bay, *Old Blood, Bad Blood, and* Youngblood*: Due Process, Lost Evidence, and the Limits of Bad Faith*, 86 Wash. U. L. Rev. 241, 303-11 (2008) (noting that the harm a criminal defendant experiences from the loss of evidence is the same regardless of whether officials acted in good or bad faith).  Many have emphasized how infrequently criminal defendants are actually able to prove that the State acted in bad faith.  *See*, *e.g.*, Teresa N. Chen, *The* Youngblood *Success Stories: Overcoming the "Bad Faith" Destruction of Evidence Standard*, 109 W. Va. L. Rev.

421, 456-57 (2007); Cynthia E. Jones, *Evidence Destroyed, Innocence Lost: The Preservation of Biological Evidence Under Innocence Protection Statutes*, 42 Am. Crim. L. Rev. 1239, 1246-47 (2005); Elizabeth A. Bawden, *Here Today, Gone Tomorrow—Three Common Mistakes Courts Make When Police Lose or Destroy Evidence with Apparent Exculpatory Value*, 48 Clev. St. L. Rev. 335, 350 (2000).  Some have advocated for the adoption of a more nuanced balancing test that would have courts weigh the government's conduct against the degree of prejudice to the accused to better accomplish the tandem goals of protecting adjudicative fairness and discouraging official misconduct, *see*, *e.g.*, Bay at 270-74, 309, as many other state courts have done pursuant to their state constitutions, *see State v. Morales*, 657 A.2d 585, 594-95 (Conn. 1995) (collecting cases).[15]

[¶32]  Second, I do not believe we should foreclose the possibility that different due process protections might be warranted under our own provisions in the Maine Constitution protecting due process rights, Me. Const. art. 1, §§ 6 and 6-A, by repeating over and over that "due process under the

---

[15]  In *State v. Morales*, for example, the Connecticut Supreme Court rejected the federal approach in favor of a balancing test that requires courts to weigh "the reasons for the unavailability of the evidence against the degree of prejudice to the accused" by considering several factors, including "the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence."  657 A.2d 585, 594-95 (Conn. 1995) (quoting *State v. Asherman*, 478 A.2d 227, 246 (Conn. 1984)).

Maine Constitution provides no greater protection to individuals than does due process under the United States Constitution." Court's Opinion ¶ 18 n.10 (quoting *State v. Anderson*, 1999 ME 18, ¶ 9, 724 A.2d 1231). This oft-quoted phrase has become something of a self-fulfilling prophecy. *See* Tinkle, *The Maine State Constitution* 44 (2d ed. 2013) (explaining that the phrase "law of the land" in Me. Const. art. 1, § 6, "was first interpreted to signify the process and procedure established under the common law," but "once the Fourteenth Amendment [of the federal constitution] came into being, the law of the land clause has been repeatedly equated with the federal due process clause"); *see also id*. at 20 (noting that this Court has often concluded that provisions of the Maine Constitution are "coterminous" with their federal counterparts "without any analysis").

[¶33] In fact, as with other provisions in the Maine Constitution with federal counterparts, we have departed from federal concepts of due process. *See State v. Collins*, 297 A.2d 620, 625-27 (Me. 1972); *see also State v. Rees*, 2000 ME 55, ¶¶ 5-6, 748 A.2d 976 (reaffirming *Collins* and noting that "federal decisions do not serve to establish the complete statement of controlling law but rather to delineate a constitutional minimum or universal mandate for the federal control of every State" (quotation marks omitted)). And we have

emphasized that "[a]lthough we may look to the construction of federal constitutional provisions in U.S. Supreme Court cases and apply the same construction as far as possible, we are not confined to that construction when . . . a more protective standard is warranted under Maine law." *Rees*, 2000 ME 55, ¶ 9, 748 A.2d 976; *see also Lego v. Twomey*, 404 U.S. 477, 489 (1972) ("Of course, the States are free, pursuant to their own law, to adopt a higher [due process] standard. They may indeed differ as to the appropriate resolution of the values they find at stake."); *Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940) ("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions.").

[¶34] More broadly, under the "primacy approach" that we have explicitly adopted, *see State v. Rowe*, 480 A.2d 778, 781 (Me. 1984), when properly raised and developed, we interpret the Maine Constitution first, examining—independently of the United States Constitution—the constitutional question pursuant to Maine values. *See State v. Flick*, 495 A.2d 339, 343-44 (Me. 1985); *State v. Larrivee*, 479 A.2d 347, 349 (Me. 1984). "It is only when we conclude that [a] claim under the state constitution fails" that we examine the claim from the "standpoint of federal constitutional law." *State v. Cadman*, 476 A.2d 1148, 1150 (Me. 1984).

24

[¶35]  Accordingly, I see no reason to curtail our ability to look to the Maine Constitution to independently effectuate the ultimate purpose of due process, which is to ensure "governmental fair play."  *State v. Sklar*, 317 A.2d 160, 166 n.6 (Me. 1974) (quotation marks omitted).

[¶36]  With that said, I agree with the Court that Chan was not denied due process in the circumstances of this case and that his state constitutional argument is not developed enough for us to address any further.  Moreover, I would reach the same conclusion even if we were to reject the federal standards and adopt an alternative balancing test given that Chan suffered little, if any, prejudice from the unavailability of the rest of the surveillance footage and that the State's failure to preserve the additional footage was, at most, negligent.

Rory A. McNamara, Esq., Drake Law, LLC, Berwick, for appellant Wai Chan

Todd R. Collins, District Attorney, Prosecutorial District #8, Caribou, for appellee State of Maine

Aroostook County Unified Criminal Docket docket number CR-2017-320