MAINE SUPREME JUDICIAL COURT            Reporter of Decisions

Decision:      2023 ME 19
Docket:        Pen-21-362
Argued:       October 5, 2022
Decided:      March 9, 2023

Panel:         STANFILL, C.J., and MEAD, JABAR, HORTON, CONNORS, and LAWRENCE, JJ.

STATE OF MAINE

v.

DAMIEN OSBORN

STANFILL, C.J.

[¶1]  Damien Osborn appeals from a judgment of conviction for aggravated trafficking of scheduled drugs (Class A), 17-A M.R.S. § 1105-A(1)(B)(1) (2022), and unlawful possession of scheduled drugs (Class C), 17-A M.R.S. § 1107-A(1)(B)(8) (2022), entered by the trial court (Penobscot County, *Anderson, J.*) following a jury trial.[1]  Osborn argues on appeal that the court erred in (A) allowing a confidential informant (CI) to testify about the CI's prior drug purchases from Osborn, (B) failing to give a curative instruction in response to improper prosecutorial argument about the

---

[1]  A third count of criminal forfeiture was not submitted to the jury but was decided by the court; a judgment of criminal forfeiture was entered at the same time as the criminal judgment.  *See* 15 M.R.S. § 5826 (2018).  Title 15 M.R.S. § 5826 has since been amended, though not in any way that affects the present case.  *See* P.L. 2021, c. 454, § 13 (effective Oct. 18, 2021) (codified at 15 M.R.S. § 5826 (2022)).

social value of CIs, (C) treating the language "one continuing scheme or course of conduct" in Count 1 of the indictment as surplusage, and (D) instructing the jury on specific unanimity for Count 1. We disagree and affirm.

## I. BACKGROUND

[¶2] Viewing the evidence admitted at trial in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt. *See, e.g.*, *State v. Athayde*, 2022 ME 41, ¶ 2, 277 A.3d 387.

[¶3] On August 22, 2019, at the direction of agents of the Maine Drug Enforcement Agency (MDEA), a CI sent a text message to Osborn about purchasing drugs. That same day, an MDEA agent drove the CI to a parking lot in Bangor, where the CI, fitted with an electronic monitoring device, entered Osborn's truck, placed $100 cash on the console, and took from the adjacent cup holder a small baggie that contained 999 milligrams of fentanyl, acetyl fentanyl, cocaine, and 4-ANPP.[2]

[¶4] On September 12, 2019, the MDEA conducted another controlled buy, during which the CI similarly entered Osborn's truck and returned with a small baggie containing 977.6 milligrams of fentanyl and acetyl fentanyl.

---

[2] A chemist for the Maine Health and Environmental Testing Laboratory testified that 4-ANPP is a "precursor in the manufacture of fentanyl."

[¶5]   On December 5, 2019, Osborn was stopped in his truck by the Bangor Police Department and arrested by MDEA agents.  The officers searched Osborn incident to the arrest and recovered two small baggies; one contained 1.1798 grams of cocaine base and the other contained 960.6 milligrams of fentanyl, 4-ANPP, and xylazine.[3]   Officers also seized $4,290 cash during the search of Osborn and the truck.

[¶6] Osborn was charged with the following five counts by complaint and then by indictment dated February 26, 2020:

- Count 1: Aggravated trafficking of scheduled drugs (Class A), 17-A M.R.S. § 1105-A(1)(B)(1), for the controlled buy of fentanyl on August 22, 2019.

- Count 2: Aggravated trafficking of scheduled drugs (Class A), *id.*, for the controlled buy of fentanyl on September 12, 2019.

- Count 3: Unlawful possession of scheduled drugs (Class C), 17-A M.R.S. § 1107-A(1)(B-1)(2), for Osborn's possession of cocaine on December 5, 2019.

- Count 4: Unlawful possession of scheduled drugs (Class C), *id.* § 1107-A(1)(B-1)(3), for Osborn's possession of cocaine base on December 5, 2019.

- Count 5: Criminal forfeiture, 15 M.R.S. § 5826 (2018),[4] of the cash found in Osborn's car on December 5, 2019.

---

[3]  Xylazine is a sedative designed for use with large animals.

[4]  Title 15 M.R.S. § 5826 has since been amended.  *See supra* n.1.

4

Each of Counts 1 through 4 also alleged that Osborn had a previous conviction for similar conduct in the U.S. District Court for the District of Connecticut. That allegation increased the sentencing class for each offense.

[¶7]  On November 25, 2020, the State filed a superseding indictment charging Osborn with three counts:

- Count 1: Aggravated trafficking in scheduled drugs (Class A), 17-A M.R.S. § 1105-A(1)(B)(1), alleging trafficking of fentanyl powder "[p]ursuant to one continuing scheme or course of conduct beginning on or about August 22, 2019[,] and continuing through December 5, 2019."

- Count 2: Aggravated trafficking in scheduled drugs (Class A), *id.*, alleging trafficking of cocaine base on December 5, 2019.

- Count 3: Criminal forfeiture, 15 M.R.S. § 5826, of the cash found in Osborn's car on December 5, 2019.

Counts 1 and 2 continued to allege that Osborn had a previous conviction for similar conduct, increasing the sentencing class for each offense.  The superseding indictment essentially made two changes.  First, it charged aggravated trafficking in the new Count 2 rather than possession of the cocaine base on December 5, 2019.  Second, it combined into one count the original Count 1, the original Count 2, and the fentanyl seizure on December 5, 2019, by alleging a single "course of conduct" pursuant to 17-A M.R.S. § 1106-A(1) (2022), which provides as follows:

Quantities of scheduled drugs involved in violations of section . . . 1105-A . . . committed pursuant to one scheme or course of conduct and confiscated within a 6-month period may be aggregated to charge a single violation of appropriate class. Subject to the requirement that the conduct of the defense may not be prejudiced by lack of fair notice or by surprise, the court may at any time order that a single aggregate count be considered as separate violations.

[¶8] On June 7, 2021, Osborn filed a motion for a bill of particulars, requesting that the State clarify its "generic allegations" of Osborn's conduct having occurred "[p]ursuant to one continuing scheme or course of conduct beginning on or about August 22, 2019[,] and continuing through December 5, 2019." The court granted the motion in an order dated June 16, 2021. The State filed its bill of particulars the next day, stating that it intended "to prove the elements of Count 1 (the indicted continuing course of conduct) based upon the controlled purchase of fentanyl on August 22, 2019, the controlled purchase of fentanyl on September 12, 2019, and the fentanyl recovered from the Defendant upon his arrest on December 5, 2019." The State also stated that Count 2 was based on "the cocaine base recovered from the Defendant upon his arrest on December 5, 2019."

[¶9] Osborn had moved for relief from prejudicial joinder in response to the original indictment; that motion became moot upon return of the superseding indictment. At the hearing on June 16, 2021, Osborn pressed for

6

severance of Counts 1 and 2 of the superseding indictment from each other, arguing that they should be tried separately. Notably, Osborn did not argue that the violations aggregated in Count 1 should be considered or tried as separate violations or counts. *See* 17-A M.R.S. § 1106-A(1) (dictating that when quantities of drugs are aggregated because violations are committed pursuant to one scheme or course of conduct, "the court may at any time order that a single aggregate count be considered as separate violations"). In an order dated June 18, 2021, the court refused to sever the two counts for trial, determining that the prejudice to Osborn of trying the cocaine and fentanyl counts together would be minimal.

[¶10] In the same June 18, 2021 order, the court addressed the effect of the allegation of "one continuing scheme or course of conduct" in Count 1. At the time of these events, the definition of "trafficking" included possession of "2 grams or more of fentanyl powder." 17-A M.R.S. § 1101(17)(F) (2018).[5] The court ordered that the State could not use section 1106-A to aggregate the drug quantities seized on each of the three dates in Count 1 to reach a quantity of

---

[5] The definition of "trafficking" in 17-A M.R.S. § 1101(17)(F) (2018) was later repealed at the same time that 17-A M.R.S. § 1103(3)(C-2) (2022) was enacted, providing that possession of four or more grams of fentanyl powder gives rise to a permissible inference of trafficking. *See* P.L. 2021, ch. 396, §§ 1, 3 (effective Oct. 18, 2021).

two grams or more, construing 17-A M.R.S. § 1101(17)(F) as requiring that two or more grams be possessed at one point in time in order to meet that definition.[6]  The court then noted that, because each instance of alleged trafficking was already a Class A offense due to Osborn's prior convictions, the "reason for aggregation"—"determining the class or grade of the offense"—was "not present in this case," making "one continuing scheme or course of conduct" mere surplusage.

[¶11]  The court held a two-day jury trial on June 21 and 22, 2021.  At trial, the CI testified that he had known Osborn before the controlled buys, that he had previously purchased drugs from Osborn, and that the purchases happened "[p]retty much the same every time."  The State introduced audio recordings of the controlled buys as well as images of text conversations between the CI and Osborn purporting to schedule the controlled buys.  Both pieces of evidence are relatively vague without further context; in the texts the CI asks Osborn "Yo where you at" and "Hey need 1 d got 100 can we meet mall," and the audio recordings capture little specific to the alleged transaction.  The

---

[6] Otherwise, the court noted, "if the State could prove that an accused personally used .2 grams of fentanyl on 10 occasions, that person would be guilty of class A trafficking, a result undoubtedly not contemplated by the legislature in creating the definition."  Neither the State nor Osborn argues that the court erred in that determination.

8

State argued before trial that the "only way that [it was] able to essentially translate the text messages and make it clear" how the CI knew to enter the truck and not discuss drugs "is from the fact that he had a course of dealing with this defendant."

[¶12]  In its closing, the State discussed the CI and argued as follows:

He's a person that the defense called interchangeably, I believe, a mole, a rat, and any number of other vaguely derogatory terms.  I submit to you that the only person who would call a confidential informant a rat or mole is someone who is guilty of something. From the perspective of any ordinary citizen, a confidential informant is doing something that we all want to see happen as a society.  They're helping catch the people that are out there actually moving illicit drugs and selling them to people on the street. Without the cooperation of people like that who are admittedly drug addicts themselves, drug users—if you weren't already an addict, you weren't already a drug user, you wouldn't have ties to drug dealers.

Osborn objected, arguing that this "type of public policy argument" is prohibited.  The State responded that it was simply rebutting statements made by Osborn's attorney during cross-examination of a witness, in which Osborn's attorney referred to CIs as "moles," "rats," "drug addicts," and "felons."  The court declined Osborn's request to provide a curative instruction to the jury, but the court instructed the jury both before and after the presentation of evidence that the attorneys' closing arguments were not evidence for the jury to consider in determining the facts.

[¶13] At the conclusion of the trial, the court instructed the jury as to the elements of Count 1 (trafficking fentanyl) and Count 2 (trafficking cocaine base). The court then instructed the jury that Count 1 required specific unanimity:

> Concerning this count, it has been argued that there is more than one incident described in the testimony that could satisfy the elements of trafficking during this time period. To return . . . a guilty verdict that is unanimous in this context, all 12 of you must agree that the State has proved all required elements of trafficking with regard to at least one incident, and it must be the same incident for all of you.

Osborn requested that the court instruct the jury on the definition of "one continuing scheme or course of conduct," asserting that it was an element of the offense. The court denied the request, reiterating its view that the language was surplusage on the facts of the case. Thus, although the charge was read to the jury, the instructions did not provide any definition of "one continuing scheme or course of conduct."

[¶14] The jury found Osborn guilty of Count 1, trafficking in fentanyl; the parties stipulated to Osborn's prior conviction and the judgment reflects that he was convicted of Class A aggravated trafficking pursuant to 17-A M.R.S. § 1105-A(1)(B)(1). On Count 2, the jury found Osborn not guilty of aggravated trafficking but found him guilty of unlawful possession of scheduled drugs

10

(cocaine base),[7] and the judgment reflects that he was convicted of Class C possession pursuant to 17-A M.R.S. § 1107-A(1)(B)(8).

[¶15] The court thereafter sentenced Osborn on Count 1 to twelve years' imprisonment, with all but six years suspended, together with four years of probation and a $400 fine. On Count 2, the court sentenced Osborn to four years' imprisonment concurrent with Count 1 and a noncumulative $400 fine.[8] The court also ordered a judgment of forfeiture on Count 3. Osborn timely appealed the convictions. *See* 15 M.R.S. § 2115 (2022); M.R. App. P. 2B(b)(1).

## II. DISCUSSION

### A. The evidence of the CI's prior interactions with Osborn was admissible.

[¶16] Osborn argues that the court erred when it allowed the CI to testify about his "prior uncharged transactions" with Osborn because such testimony constituted inadmissible character evidence under Maine Rule of Evidence

---

[7] The court instructed the jury that it could find Osborn guilty of the "lesser included offense" of possession. Unlawful possession is not a lesser included offense of unlawful trafficking in scheduled drugs, however, because one need not "possess" the drugs in order to "traffic" in them. *State v. Hardy*, 651 A.2d 322, 325 (Me. 1994). Pursuant to 17-A M.R.S. § 13-A(3) (2022), an instruction on the alternative offense of possession is nonetheless appropriate if it is justified by the evidence, as it was here, and both the State and the defendant consent to its being given. There is nothing specific in the record to show such consent, but we infer it given that neither party objected to the instruction and Osborn referenced possession in his opening.

[8] Although neither the docket record nor the judgment and commitment form reflects that Osborn's sentences were to run concurrently, the audio recording of the proceeding establishes that the court actually imposed concurrent sentences. We direct an amendment of the docket and the judgment and commitment form to correctly reflect the concurrent nature of the sentences imposed.

404(b) and because its probative value was substantially outweighed by a danger of unfair prejudice, rendering it inadmissible under Maine Rule of Evidence 403. We disagree.

[¶17] "We review a trial court's decision to admit evidence of prior bad acts pursuant to M.R. Evid. 404(b) for clear error . . . ." *State v. Pillsbury*, 2017 ME 92, ¶ 22, 161 A.3d 690. "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." M.R. Evid. 404(b). However, evidence of prior bad acts may be admissible "for any other permissible purpose, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Pillsbury*, 2017 ME 92, ¶ 22, 161 A.3d 690 (quotation marks omitted).

[¶18] Here, the trial court did not commit clear error in admitting the CI's testimony regarding the manner in which he had previously met with Osborn to obtain drugs. As the court ruled in advance of trial, such evidence was probative of the relationship between the CI and the defendant—a relationship that "might cause [the CI] to call [Osborn] to purchase drugs." That the CI and Osborn had a prior course of communicating via text message to coordinate exchanges for drugs, which took place in Osborn's truck, is relevant

to Osborn's knowledge that the CI was requesting drugs in his cryptic August 22 and September 12, 2019, text messages to Osborn. Evidence of the CI's prior transactions with Osborn is also relevant to Osborn's intent to sell drugs to the CI on August 22 and September 12, 2019, because the jury could have concluded that on those dates, after receiving the text messages from the CI, the CI similarly met inside Osborn's truck, where they did not speak about drugs but where drugs were exchanged. *See State v. Anderson*, 2016 ME 183, ¶¶ 12-15, 152 A.3d 623 (explaining that references to the defendant's prior involvement selling drugs was not improper 404(b) evidence when it was probative of whether the defendant intended to aid in the trafficking of drugs at the later date of the charged conduct).

[¶19] Likewise, the court did not err or abuse its discretion in admitting the evidence after weighing its probative value against the danger of unfair prejudice under Rule 403. A court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." M.R. Evid. 403. We review a trial court's weighing of probative value against the danger of unfair prejudice for an abuse of discretion. *Pillsbury*, 2017 ME 92, ¶ 22, 161 A.3d 690.

[¶20]  Here, the court permitted the State to inquire only generally into the nature of the CI's prior dealings with Osborn so as to establish the basis for how the CI would know how to contact Osborn for drugs.  Given the vague nature of the text messages sent from the CI to Osborn and the limited conversation recorded between the CI and Osborn, the CI's testimony regarding how he previously obtained drugs—by texting Osborn and meeting him in his truck—was not cumulative of other less prejudicial evidence and in fact demonstrated the relevance of other evidence presented.  *See State v. Michaud*, 2017 ME 170, ¶ 8, 168 A.3d 802 (explaining that a court must weigh the probative value of the evidence when "its value is merely cumulative of other less prejudicial evidence" (quotation marks omitted)); *State v. Smith*, 612 A.2d 231, 235 (Me. 1992) (concluding that the trial court correctly exercised its discretion to admit evidence of the defendant's prior assaults on the victim when the testifying victim did not relate any specific details or instances of those prior assaults).

**B.    Any prosecutorial error did not affect Osborn's substantial rights.**

[¶21]  Osborn challenges the comments[9] made by the prosecutor during his closing argument about the role of CIs in society.  Because Osborn objected

---

9  Osborn argues that the comments amount to prosecutorial misconduct.  However, as we explained in *State v. White*, 2022 ME 54, ¶ 19 n.9, 285 A.3d 262, a discussion of prosecutorial

to the prosecutor's argument, we review the preserved claim of prosecutorial error for harmless error. *See Pillsbury*, 2017 ME 92, ¶ 18, 161 A.3d 690. "Harmful error is error that affects the criminal defendant's substantial rights, meaning that the error was sufficiently prejudicial to have affected the outcome of the proceeding." *Id.* (quotation marks omitted).

[¶22] We analyze claims of prosecutorial error "in the overall context of the trial." *State v. Ayotte*, 2019 ME 61, ¶ 13, 207 A.3d 614 (quotation marks omitted). "This includes taking into account the statements, comments, and strategy of the defense, especially when the prosecutor's statements are made in response to the theory, argument, or provocation of the defendant or defense counsel." *State v. Dolloff*, 2012 ME 130, ¶ 44, 58 A.3d 1032.

[¶23] A prosecutor's statements cannot "invite the jury to make its decision based on something other than the evidence." *Pillsbury*, 2017 ME 92, ¶ 21, 161 A.3d 690. Because jurors "should not be invited to arrive at a verdict for any reason other than their evaluation of the evidence," we have "long criticized prosecutors' appeals to public perception or other social issues that go beyond the evidence produced at trial," *State v. Woodard*, 2013 ME 36, ¶ 34,

misconduct focuses on the subjective intent of the prosecutor, while a discussion of prosecutorial error focuses on the impact of the prosecutor's behavior on the due process rights of the defendant. Here, Osborn does not allege that the prosecutor's statements were made in bad faith and instead focuses on the impact the prosecutor's statements had on his trial.

68 A.3d 1250, and have likewise concluded that the use of "the authority or prestige of the prosecutor's office to shore up the credibility of a witness, sometimes called 'vouching,'" constitutes prosecutorial error, *Dolloff*, 2012 ME 130, ¶ 42, 58 A.3d 1032.

[¶24]  Here, the prosecutor's statements may be viewed in isolation as vouching and improperly appealing to social norms, which are facts not in evidence.  In the context of the entire trial and in particular Osborn's defense strategy, the prosecutor's comments appear targeted at rebutting Osborn's theory that the CI was not credible and could have framed him.  *See State v. Wai Chan*, 2020 ME 91, ¶ 25, 236 A.3d 471 ("A prosecutor is . . . permitted to comment on the plausibility of the defendant's theory." (quotation marks omitted)).   The comments were responsive to defense counsel's cross-examination of a witness, during which he suggested that CIs are "moles," "rats," "drug addicts," and "felons."  The comments were also isolated to one instance in the prosecutor's closing argument.  *See State v. White*, 2022 ME 54, ¶ 40, 285 A.3d 262 (holding that prosecutorial errors called for vacating a conviction in part because the errors "were not isolated but framed the trial from its beginning to its closing").

[¶25]  Finally, the court instructed the jury both before and after the presentation of evidence that the attorneys' opening statements and closing arguments were not testimony for the jury to consider in determining the facts, and it provided instruction on the burden of proof and the presumption of innocence.  *See State v. Begin*, 2015 ME 86, ¶ 28, 120 A.3d 97 (concluding that the trial court remedied any prejudice resulting from prosecutorial error when it instructed the jury on its role, the presumption of innocence, and the State's burden of proof); *Pillsbury*, 2017 ME 92, ¶¶ 19-21, 161 A.3d 690 (concluding that there was no invitation to make a decision based on facts not in evidence and noting that the court had instructed the jury that opening statements and closing arguments were not facts in evidence).  Thus, given the entire context of the trial, we conclude that any prosecutorial error did not affect Osborn's substantial rights.

C.    **In the particular circumstances of this case, the allegation in the indictment of "one continuing scheme or course of conduct" was surplusage.**

[¶26]  Osborn raises several arguments stemming from the court's treating as surplusage the phrase "one continuing scheme or course of conduct" in Count 1 of the superseding indictment, including that the court should have instructed the jury that the language was an element of the underlying offense

and that the phrase is unconstitutionally vague. We agree with the trial court that the allegation in Count 1 that Osborn trafficked in fentanyl "[p]ursuant to one continuing scheme or course of conduct" is surplusage on the specific facts of this case.

[¶27] Language in an indictment is surplusage if it neither adds nor detracts from the sufficiency of the indictment and, accordingly, may be disregarded or stricken without affecting the legal substance of the count. *See State v. Grant*, 266 A.2d 232, 234-35 (Me. 1970); *see also State v. Mihill*, 299 A.2d 557, 558 (Me. 1973) (holding that if an "allegation may be struck out of the indictment without injury to the charge, it may be treated as surplusage" (quotation marks omitted)). "The test for determining whether an indictment is sufficient is whether an accused of reasonable and normal intelligence would, by the language of the indictment, be adequately informed of the crime charged and the nature thereof, so that the accused could properly prepare his defense and be protected against a subsequent prosecution for the same cause." *State v. Gauthier*, 2007 ME 156, ¶ 17, 939 A.2d 77 (alterations and quotation marks omitted); *see also* Me. Const. art. I, § 6. Further, "one must look not only to the language of the indictment itself but to the accompanying Bill of Particulars . . .

18

to elucidate ambiguities appearing in the indictment." *State v. Toppi*, 275 A.2d 805, 808 (Me. 1971).

[¶28]  Here, Count 1 of the superseding indictment is legally sufficient because it includes all of the elements of a charge of aggravated trafficking in violation of 17-A M.R.S. § 1105-A(1).  Count 1 alleges that, on three separate dates, Osborn "did intentionally or knowingly traffick in what he knew or believed to be a scheduled drug, which was in fact fentanyl powder," and that he furthermore had a prior conviction in federal court in Connecticut for similar conduct.  These allegations assert the essential facts constituting a Class A offense under 17-A M.R.S. § 1105-A(1)(B)(1).  The indictment therefore adequately informed Osborn of the charge in Count 1 and the nature of that crime without reference to the language derived from 17-A M.R.S. § 1106-A.[10]

[¶29]  Ordinarily, aggregation statutes are used to increase the sentencing classification, so that the aggregated charge has a higher sentencing classification than would each underlying charge prosecuted individually.

> Courts regularly encounter indictments that may aggregate,
> in one count of the indictment, several identical crimes committed

---

[10]  Though we have never formally held that to prevail on appeal a defendant must show prejudice arising from surplus language in an indictment, we note that Osborn has failed to show how the inclusion of the surplusage has prejudiced him.  *See State v. Mihill*, 299 A.2d 557, 558 (Me. 1973) (affirming a conviction while noting that the defendant had "demonstrated no prejudice resulting from th[e] superfluous allegation").  Even so, we caution that the inclusion of unnecessary language in a charging instrument creates a potential for jury confusion and does not reflect good practice.

> against one or more victims. Such charging practices are encountered most frequently when there are allegations of multiple drug transactions, multiple sex acts committed against a minor child, or multiple thefts and aggregation of the theft values enhances the seriousness of the charge.

*State v. Fortune*, 2011 ME 125, ¶ 26, 34 A.3d 1115; *see also State v. Fournier,* 617 A.2d 998, 1001 (Me. 1992) (Collins, J., dissenting) (noting that 17-A M.R.S.A. § 352(5)(E) (1983),[11] a statute permitting aggregation of theft charges, "allows the State to aggregate amounts of value involved in related thefts to achieve a higher sentencing classification than if each theft were prosecuted separately" and "give[s] the State flexibility in its charging decisions in theft cases to ensure that the degree of the offense charged is 'appropriate' and bears a reasonable relationship to the seriousness of the defendant's conduct"). Here, each alleged transaction was sufficient by itself to support a conviction of Class A aggravated trafficking because of Osborn's prior conviction and the scheduled drug involved. The quantity of fentanyl trafficked was irrelevant to the charged crime or the sentencing class in this case.[12] The number of transactions did not

---

[11] Title 17-A M.R.S.A. § 352(5)(E) (1983) has since been amended, though the amendments are not relevant in the present case. *See* P.L. 2001, ch. 383, § 32 (effective Jan. 1, 2003) (codified at 17-A M.R.S. § 352(5)(E) (2022)).

[12] As noted above, *see supra* ¶ 10, the trial court did not permit the State to use 17-A M.R.S. § 1106-A(1) (2022) to aggregate the quantities of fentanyl seized on each of the three dates in Count 1 because it construed 17-A M.R.S. § 1101(17)(F) as requiring that two or more grams be possessed at one point in time in order to take advantage of that definition. We need not decide here whether, if a jury was tasked with aggregating drug quantities pursuant to section 1106-A, the jury

change the sentencing class. Moreover, it was not necessary to formally strike the surplus language, particularly where the court clearly advised the parties in advance that this was how it viewed the charge.

[¶30] We also note that 17-A M.R.S. § 1106-A(1) itself provides that "the court may at any time order that a single aggregate count be considered as separate violations." Here, although Osborn moved to sever Count 1 from Count 2 for trial, he did not ask that the single aggregate count be considered as three separate violations. *See Fortune*, 2011 ME 125, ¶ 27, 34 A.3d 1115 ("[M]ost defendants might be loath to convert one count to several counts charging an identical crime, with the consequent consecutive sentencing possibilities.").

[¶31] Accordingly, on the specific facts of this case, when coupled with the specific unanimity instruction as discussed below,[13] the court did not err in treating the "one continuing scheme or course of conduct" language as surplusage. We therefore need not decide whether "one scheme or course of

---

would have to find that each instance of conduct that is part of the alleged "scheme or course of conduct" by itself constituted trafficking.

[13] In construing the stalking statute, 17-A M.R.S. § 210-A(1)(A) (2022), which includes a "course of conduct" as an element of the offense, we have held that only general unanimity is required; specific unanimity "among the jurors is not required . . . as to each act that makes up that course of conduct." *State v. Elliott,* 2010 ME 3, ¶ 27, 987 A.2d 513.

conduct" is a discrete element in cases where it is not surplusage.[14]  Likewise, the court did not err in failing to instruct the jury on its meaning.  Finally, we need not address Osborn's argument that the phrase "one scheme or course of conduct" in 17-A M.R.S. § 1106-A(1) is unconstitutionally vague because "[w]e do not reach constitutional issues when it is unnecessary to do so." *Widewaters Stillwater Co. v. Bangor Area Citizens Organized for Responsible Dev.*, 2002 ME 27, ¶ 11, 790 A.2d 597.

**D.    The instruction that the jury must unanimously agree on only one specific incident in order to convict Osborn on Count 1 was correct in the circumstances of this case.**

[¶32]  Osborn contends that the court erred in instructing the jury that it had to unanimously agree on only one of the three instances of alleged conduct in order to convict Osborn of Count 1.  We disagree.

[¶33]   Unanimity in convictions is indispensable under the Maine Constitution, and "[e]rrors in criminal cases that affect constitutional rights are reviewed to determine that we are satisfied, beyond a reasonable doubt, that the error did not affect substantial rights or contribute to the verdict." *Gauthier*, 2007 ME 156, ¶ 14, 939 A.2d 77; *see also* Me. Const. art. I, § 7.

---

[14] *See Buckwalter v. State*, 23 P.3d 81, 85 (Alaska Ct. App. 2001) (Discussing aggregation of thefts under the Model Penal Code and noting that other jurisdictions "have explicitly held that a finding of one course of conduct is an element of theft that must be included in the indictment when the government relies on aggregation to determine the degree of theft").

[¶34] "A specific unanimity instruction explains to jurors that they are required to unanimously agree that a single incident of the alleged crime occurred that supports a finding of guilt on a given count." *State v. Rosario*, 2022 ME 46, ¶ 34, 280 A.3d 199 (quotation marks omitted). Thus, if the State alleges multiple instances of the charged offense, any one of which is independently sufficient for a guilty verdict as to that charge, specific unanimity instructions are proper. *See Fortune,* 2011 ME 125, ¶ 31, 34 A.3d 1115 ("When separate, similarly situated victims or similar incidents such as thefts or drug transactions are the evidence supporting a single charge, the jury must unanimously find that one specific incident occurred . . . in order to convict.").

[¶35] Here, the instruction on specific unanimity was appropriate given the allegations against Osborn and the evidence presented in this case. Because the "scheme or course of conduct" language was surplusage, any one of the three instances of drug sales alleged in Count 1 was sufficient to support a guilty verdict on that count.[15]

---

[15] We need not decide today whether specific unanimity instructions are required when the State charges a defendant with a violation of 17-A M.R.S. § 1106-A and seeks to aggregate the quantities of drugs sold across multiple instances of alleged conduct.

### III. CONCLUSION

[¶36]  The court did not err in allowing the CI to testify about his prior history of drug interactions with Osborn because the testimony was limited and relevant to motive, intent, plan, and knowledge.  With respect to the prosecutor's closing argument, any improper appeal to social mores did not affect Osborn's substantial rights.  On the specific facts and circumstances of this case, the allegation in the indictment of "one continuing scheme or course of conduct" was surplusage and not an element of the crime requiring a jury instruction.  Finally, because the allegation of "one continuing scheme or course of conduct" was surplusage and a single alleged transaction was sufficient to support Osborn's conviction of Class A aggravated trafficking in fentanyl, the court properly instructed the jury that specific unanimity as to only one incident was required to convict Osborn of Count 1.

The entry is:

> Judgment affirmed.  The trial court is directed to amend the docket and the judgment and commitment to correctly reflect the concurrent term of the sentences imposed.

24

Timothy E. Zerillo, Esq. (orally), Zerillo Law Firm, LLC, Portland, for appellant Damien Osborn

Aaron M. Frey, Attorney General, and Jason Horn, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2019-4468
FOR CLERK REFERENCE ONLY