MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions

Decision:      2022 ME 46
Docket:        Aro-21-291
Argued:        May 10, 2022
Decided:       August 25, 2022

Panel:         STANFILL, C.J., and MEAD, JABAR, HORTON, CONNORS, and LAWRENCE, JJ., and HUMPHREY, A.R.J.*

STATE OF MAINE

v.

PEDRO J. ROSARIO

STANFILL, C.J.

[¶1]   Pedro J. Rosario appeals from a judgment of conviction of aggravated trafficking of scheduled drugs (Class A), 17-A M.R.S. § 1105-A(1)(M) (2022), entered by the trial court (Aroostook County, *Stewart, J.*) after a jury trial.  Rosario argues that the court erred in denying his motion to suppress and also erred with respect to enforcement of the court's sequestration order, the jury instructions, and the sentence.  We affirm.

---

* Justice Humphrey sat at oral argument and participated in the initial conference while he was an Associate Justice and, as directed and assigned by the Chief Justice, is now participating in this appeal as an Active Retired Justice.

## I.  BACKGROUND

[¶2]  Rosario was indicted for aggravated trafficking in fentanyl powder in a quantity of six grams or more.  *See id.*  On October 30, 2020, Rosario moved to suppress evidence obtained on December 18, 2019, including incriminating statements he made, after the stop of a gray Kia Sorento in which Rosario was a passenger.

[¶3]  At the suppression hearing on January 11, 2021, three Maine Drug Enforcement Agency (MDEA) Agents and two Maine State Police Officers testified.  As detailed below, law enforcement testified about monitored telephone calls between Rosario and a confidential informant (CI) setting up a drug transaction for December 18, 2019, in Houlton.  The court admitted Maine State Police Trooper Hunter Cotton's video recording of the traffic stop of the Kia and emails from T-Mobile containing GPS data for a cell phone.  In a written decision following the hearing, the court denied Rosario's motion to suppress. Rosario moved for additional and amended findings and an amended order, and the court denied his motion.

[¶4]  The court held a jury trial on June 1-3, 2021.  The State offered testimony from the relevant MDEA Agents, a drug chemist, and Kelvin Mosquea-Guillen.  The evidence showed that while law enforcement was

still with the Kia at the side of the road, law enforcement also stopped a gray Toyota driven by Mosquea-Guillen; the illegal drugs were found in the Toyota.

[¶5]  Two packages were seized from Mosquea-Guillen's vehicle, though only one package, weighing approximately 111 grams and containing fentanyl powder, was admitted into evidence.[1]  Mosquea-Guillen testified that Rosario had paid him to rent a car for Rosario and to drive his own vehicle to Houlton to pick up a person who would give Mosquea-Guillen money.  The Kia in which Rosario was riding was searched and, although no contraband was seized from it, the search uncovered cell phones and a rental contract that the State used to connect Rosario to Mosquea-Guillen.  Rosario did not testify and called no witnesses.  The jury found Rosario guilty.

[¶6]  The court held a sentencing hearing on August 27, 2021, and sentenced Rosario to twenty-five years in prison, with ten years suspended and a four-year probationary period, and ordered him to pay a $25,000 fine.

[¶7]  Rosario timely appealed from the judgment.[2]

---

[1] The second package allegedly contained over 900 grams of a similar powder but was not offered or admitted into evidence.

[2] The Sentence Review Panel denied Rosario's application for leave to appeal from the sentence. *See* 15 M.R.S. §§ 2151, 2152 (2022); M.R. App. P. 20(a)(1), (f).

## II. DISCUSSION

### A. Motion to Suppress

[¶8]  The court found the following facts, all of which are supported by competent evidence in the suppression record and which we view in the light most favorable to the suppression court's order.  *See State v. Cunneen*, 2019 ME 44, ¶¶ 2, 13, 205 A.3d 885.

[¶9]  In September 2019, a CI working with the MDEA told Agent William Campbell that a person, with a last name of Messon, had asked the CI if the CI wanted to conduct drug deals.  Campbell had previously worked with the CI and found the CI reliable, and he told the CI to contact Messon.  The CI and Messon had multiple calls, which the MDEA recorded, discussing the sale and pricing of illegal drugs.  During one call, Messon said his brother would contact the CI, but Messon did not provide his brother's name.  The CI received a call minutes later and spoke with a man, who identified himself as "Peter," about a drug transaction.

[¶10]  Campbell investigated Messon and came to believe that "Peter" was Pedro Rosario.[3]  Campbell researched background information on Rosario and obtained Rosario's photograph.

---

[3]  Campbell testified that "Peter" translated to Spanish is "Pedro."  The court found that Campbell learned that Messon's brother was Pedro Rosario.  Because the actual records that Campbell

[¶11]  The CI and Peter had additional calls, which the MDEA monitored and recorded, about drug transactions.  In December 2019, the CI and Peter agreed to meet, but the transaction was cancelled because Peter was unable to find a driver.  Peter later found a driver, and Peter and the CI agreed to meet in Houlton on December 18, 2019, where Peter would sell drugs to the CI.

[¶12]  On December 17, 2019, Campbell obtained a search warrant for GPS location data of the cell phone number Peter was using.  It was MDEA Agent Forrest Dudley's role to receive the GPS location data from T-Mobile and monitor the phone's location.[4]  On December 18, 2019, the agents and officers met, reviewed investigation details, and circulated Rosario's photograph, which was seen by Trooper Cotton and MDEA Agent John Gaddis.

[¶13]  Around 9:00 a.m. on December 18, 2019, Peter told the CI that he was on his way north in a gray Toyota.  Campbell suspected that the vehicle had

consulted were not supplied to Rosario, the court excluded testimony about what Campbell discovered to lead to his belief that Peter was Pedro Rosario.

[4]  We note that the admitted emails from T-Mobile show that the number had a 508 area code. *Cf. State v. Athayde*, 2022 ME 41, ¶ 29, 277 A.3d 387 (explaining that because neither party contested the authenticity or accuracy of the admitted video recording, we may "listen to and view the recording[]" in its "entirety as we review the court's findings and conclusions").  We take judicial notice that this area code is from southeastern Massachusetts.  *See* M.R. Evid. 201(b), (d); *State v. Reeves*, 2022 ME 10, ¶ 31 n.7, 268 A.3d 281 (taking judicial notice of pandemic management orders and the number of COVID-19 cases as "matters of public record"); *State v. Petersen*, 268 A.2d 482, 483 (Me. 1970); *see also Orsi v. Sheik Falah Bin Zayed Bin Sultan Al-Nahyan*, No. 11-10451-DPW, 2012 U.S. Dist. LEXIS 136798, at *20-21 n.6 (D. Mass. Sept. 25, 2012) (taking judicial notice of the part of New York associated with a phone number's area code).  The suppression record does not reveal the name associated with the cell phone account.

6

out-of-state license plates. Over the next few hours Dudley shared with the agents and officers the location information from the emails showing the phone traveling north.[5] An email from T-Mobile at 1:47 p.m. indicated that the phone was in Houlton near the spot where Peter and the CI had agreed to meet. Peter then called the CI and called off the transaction because he thought he saw law enforcement near the meeting location; thereafter the emails showed the phone traveling south on I-95. The interval between emails was shortened to less than five minutes.

[¶14] Minutes before 2:30 p.m., an email showed the phone was near the Island Falls exit; the data was accurate to within twenty-five meters. This location was south of Maine State Police Sergeant Chadwick Fuller, who headed south on I-95. Fuller caught up to a gray Kia sport utility vehicle, with Massachusetts license plates, that was behind a white vehicle.[6]

[¶15] Cotton was parked at an I-95 crossover and saw two vehicles pass him, followed by Fuller's vehicle. Cotton proceeded south behind Fuller to

---

[5] The GPS location data was received every fifteen minutes initially and then every five minutes once the vehicle got closer to the meeting destination. At each interval, T-Mobile would email the latitude and longitude data for the phone's location, unless the phone was off or there was no reception, in which case the email said "ABSENT SUBSCRIBER."

[6] We viewed Cotton's video recording of the traffic stop and determined the color of the vehicles. *See Athayde*, 2022 ME 41, ¶ 29, 277 A.3d 387.

assist and told the other officers that he identified Rosario in the gray vehicle when it passed him. Based on the GPS location data and the Kia's out-of-state license plates, Fuller initiated a "felony stop" of the Kia. He did not see the Kia's occupants before the stop.

[¶16] The traffic volume on I-95 was very light at the time of the stop at 2:32 p.m. When Fuller activated his lights, the Kia stopped in the breakdown lane; the white vehicle ahead of the Kia continued south. Fuller yelled for the driver to exit the vehicle, and the driver complied and was immediately handcuffed. The passenger opened the door but appeared confused. At that point, Gaddis, who had arrived on the scene, ordered in Spanish for the passenger to exit the vehicle. Gaddis recognized the passenger as Rosario.[7] Rosario complied with Gaddis's instructions and was immediately handcuffed.

[¶17] Based on its findings, the court concluded that when the officers stopped the Kia, they had a reasonable articulable suspicion, and indeed probable cause, to believe that it contained the person who had agreed to travel and sell drugs to the CI in Houlton and that criminal conduct had taken place or was occurring. The court further concluded that probable cause existed to

---

[7] Gaddis testified that he "[i]mmediately" recognized Rosario when he was instructing Rosario to exit the vehicle, based on the photograph he had seen that day.

arrest Rosario because a prudent and cautious person would believe that the Kia contained the phone; that the person who used the phone agreed to travel to Houlton to sell drugs; and that Pedro Rosario was the Peter who agreed to sell drugs. The court thus denied Rosario's motion to suppress.

[¶18] Rosario concedes that law enforcement had "reasonable articulable suspicion" for the stop. He argues that law enforcement lacked probable cause, however, and that he was under *de facto* arrest when he was ordered from the vehicle, allegedly at gunpoint, after the driver was handcuffed but before Gaddis recognized Rosario. The State contends competent evidence supports the court's findings that, prior to the stop, law enforcement had probable cause to believe that the phone and Peter were in the vehicle and that Peter had engaged in a conspiracy to traffick illegal drugs. The State further argues that the agents and officers had a legitimate concern for their safety and took reasonable steps under the circumstances.

[¶19] We review for clear error the court's factual findings on a motion to suppress and review de novo the court's ultimate determination regarding suppression. *State v. Lagasse*, 2016 ME 158, ¶ 11, 149 A.3d 1153 (stating that we will uphold the "denial of a motion to suppress if any reasonable view of the evidence supports" the decision (quotation marks omitted)).

[¶20]  Law enforcement is "authorized to make warrantless arrests under certain circumstances, including when an officer has probable cause to believe that a person has committed any Class A, Class B, or Class C crime." *Id.* ¶ 13; 17-A M.R.S. § 15(1)(A)(2) (2022).  There is probable cause when the "facts and circumstances within the knowledge of the officers and of which they have reasonably trustworthy information would warrant a prudent and cautious person to believe that the arrestee did commit or is committing the felonious offense."  *Lagasse*, 2016 ME 158, ¶ 13, 149 A.3d 1153 (quotation marks omitted).  Probable cause is an objective test and "includes the collective information known to the police and is not limited to the personal knowledge of the arresting officer."  *Id.* ¶ 14 (stating that the standard "has a very low threshold" (quotation marks omitted)); *see also State v. Martin*, 2015 ME 91, ¶ 10, 120 A.3d 113 (explaining that probable cause requires "more than mere suspicion" but "can be satisfied on less than" the proof required for "preponderance of the evidence" (quotation marks omitted)).

[¶21]  Here, there was probable cause, prior to the stop, to stop the Kia and arrest its occupants.  The MDEA monitored multiple calls, between a known and reliable CI and Peter, discussing drug transactions, including a transaction arranged for December 18 in Houlton.  Pursuant to a search warrant, law

enforcement received emails containing GPS data for the cell phone number used by Peter showing that the phone was traveling north after Peter informed the CI that he was on his way north, that the phone was near the meeting location, and that the phone was traveling south after Peter called off the transaction. The GPS data, accurate to within twenty-five meters, showed that the phone was near the Island Falls exit, which was just south of Fuller, who caught up to a gray Kia with Massachusetts license plates. The traffic volume on I-95 was light, and prior to the stop Cotton saw the Kia and told the other officers that he identified Rosario in the vehicle,[8] based on a photograph of Rosario that he had been shown at the briefing.

[¶22] The facts and circumstances meet the "very low threshold" of probable cause. *Lagasse*, 2016 ME 158, ¶¶ 4-5, 13-14, 18, 149 A.3d 1153 (quotation marks omitted); *see Martin*, 2015 ME 91, ¶¶ 2-4, 11, 14, 120 A.3d 113 (stating that the court's finding, that the police's investigation "provided a clear basis for probable cause to believe that there would be contraband in the vehicle" or on the person inside, was "well supported by the record," where

---

[8] Although both sides agreed at the hearing that Cotton's actions did not contribute to Fuller's decision to effectuate the stop, probable cause includes the police's collective knowledge and is not limited to the arresting officer's personal knowledge. *See State v. Lagasse*, 2016 ME 158, ¶ 14, 149 A.3d 1153.

police had a warrant and tracked the number of a person who was denoted to a CI as a drug deliveryman (quotation marks omitted)); *State v. Journet*, 2018 ME 114, ¶¶ 18-22, 191 A.3d 1181 (determining there was probable cause where a CI, found at a residence where there were drugs, showed officers text messages indicating a drug deal, and the defendant arrived close to when the drug supplier was anticipated to arrive, driving a car that matched the CI's description).

[¶23]  Although there was a white vehicle ahead of the Kia, Rosario did not move for further findings regarding this other vehicle.[9]  We therefore assume that the court found the facts necessary to determine that the Kia was more likely than the other vehicle to contain the phone that law enforcement was tracking.  *See State v. Sasso*, 2016 ME 95, ¶¶ 18-19 & n.4, 143 A.3d 124; M.R.U. Crim. P. 41A(d); *cf. Sulikowski v. Sulikowski*, 2019 ME 143, ¶¶ 8, 21-22, 216 A.3d 893.  This finding is supported by the record evidence, including Cotton's identification of Rosario in the gray Kia, the fact that the gray Kia had Massachusetts license plates and that the cell phone number being tracked had a Massachusetts area code, and the spacing of the two vehicles as reflected in

---

[9]    Rosario's motion for additional and amended findings only pertained to Campbell's investigation and the photograph of Rosario.

the video. *See State v. Athayde*, 2022 ME 41, ¶ 29, 277 A.3d 387. Law enforcement had probable cause to arrest the Kia's occupants, and the court thus did not err in denying Rosario's motion to suppress. *See State v. Flint*, 2011 ME 20, ¶ 9, 12 A.3d 54 (concluding that it was not necessary to determine whether the officers "exceeded the bounds of a permissible investigatory stop because there was probable cause to arrest" the defendant).[10]

## B. Sequestration Instruction

[¶24] Prior to a mid-morning break during Campbell's testimony on the first day of trial, Rosario's counsel requested "that the witness be sequestered and not discuss his testimony until it's finished." The court granted the request and instructed that "during this recess" Campbell "remain sequestered as other witnesses are" and not discuss his testimony with the State's attorney until Campbell finished his testimony. After Campbell and Peter Johnson, the supervisor of the MDEA's Aroostook County office, testified, both attorneys

---

[10] We need not look to the events after the stop because probable cause already existed to stop and arrest the vehicle's occupants. However, there was additional probable cause to arrest Rosario after he exited the vehicle and Gaddis "[i]mmediately" recognized him from the photograph Gaddis had seen that day at the briefing. Further, although the officers had previously handcuffed the driver and were yelling, the fact that law enforcement required Rosario to exit the vehicle was not unreasonable because "an officer may always require the occupants of a lawfully stopped vehicle to exit the vehicle without violating the Fourth Amendment." *State v. Donatelli*, 2010 ME 43, ¶¶ 6, 14-18, 995 A.2d 238 (determining that a stop involving four police vehicles and five officers was not a de facto arrest because, among other reasons, investigative stops are dangerous, the defendant "was not traveling alone and was suspected of transporting illegal drugs," and the officers did not block the defendant's car).

indicated they had no more questions for either witness. When the court later asked at side bar if chain of custody was at issue in the case, Rosario's attorney said yes. The State then said that it may need to recall either Campbell or Johnson, and Rosario did not object.

[¶25] The next day, the State recalled Campbell and Johnson to testify about the chain of custody. Rosario objected, arguing that Campbell was subject to sequestration and saw Johnson's testimony; that the State did not preserve the right to recall the witnesses; that counsel limited his cross-examination based on the testimony as presented; and that Rosario would be prejudiced because the jury had already heard chain-of-custody testimony. The court overruled the objection, reasoning that the State had not rested and that the sequestration instruction was not violated because the new testimony would not correct prior testimony but reflect the witnesses' "particularized or discrete function in the chain of custody."[11]

[¶26] Rosario argues the court erred in determining that there was no violation of the court's sequestration order and therefore abused its discretion

---

[11] Rosario's counsel later objected again, adding that the "agents spoke before testifying today specifically about the chain of custody." Johnson testified that although he had spoken about the chain of custody with Campbell and the State's attorney, he did not discuss or rehearse his testimony with Campbell.

14

in imposing no sanction and allowing Campbell and Johnson to be recalled. We disagree.

[¶27] "[T]he sequestration of witnesses is wholly discretionary." *State v. Pickering*, 491 A.2d 560, 563 (Me. 1985) (explaining that the main goal is to prevent a witness from hearing testimony "so as to be able to conform his own testimony to that given by the other" (quotation marks omitted)); *see* M.R. Evid. 615. We review for clear error a court's determination whether a sequestration order was violated. *See State v. Bennett*, 416 A.2d 720, 726-27 (Me. 1980). Violation of a sequestration order does not mean a witness is automatically disqualified; rather, it is within the court's discretion "whether such a witness can testify." *Pickering*, 491 A.2d at 563.

[¶28] Here, the court did not err because there was no violation of the court's limited sequestration instruction given during a break in Campbell's testimony. Rosario requested only "that the witness be sequestered and not discuss his testimony until it's finished." The court instructed "that during this recess" Campbell remain "sequestered from" and "not discuss [his] testimony with" the State's attorney. There was no request for or order sequestering all witnesses. The phrase "as other witnesses are" was used in relation to Campbell's sequestration, and the court sequestered Campbell from the State's

attorney during the break in his testimony. The instruction also did not apply to the time after Campbell completed his testimony on the first day or sequester Campbell from other witnesses.[12] *See State v. Jackson*, 1997 ME 174, ¶¶ 1, 5-6, 697 A.2d 1328 (determining that a witness's discussion, prior to her testimony, with a witness from another defendant's trial relating to the same incident was permissible absent "any request for more stringent restrictions"). Indeed, given that Campbell was designated as the State's primary representative, he was authorized to remain throughout the trial. *See* M.R. Evid. 615(b) (stating that the court is not authorized to exclude "[a]n officer or employee of a party . . . after being designated as the party's representative by its attorney").[13]

## C. Jury Instructions

[¶29] Rosario argues that the court erred in instructing the jury regarding possession and in failing to give an instruction on specific unanimity. At trial, Rosario failed to object to the possession instruction and failed to

---

[12] In addition, because the instruction's terms were directed to Campbell and did not explicitly apply to any other witnesses, there was no violation of the sequestration instruction by Johnson.

[13] Even if the sequestration instruction had been violated, the court did not abuse its discretion in allowing Campbell and Johnson to be recalled. *See State v. Cruz*, 594 A.2d 1082, 1085 (Me. 1991). Rosario does not point to specific prejudice that resulted from Campbell hearing Johnson's testimony or from the discussions that Rosario's counsel contends violated the order, *see id.*; Rosario's counsel had the chance to ask about those discussions; and the testimony primarily related to each witness's own actions or the MDEA's general processes.

16

request a specific unanimity instruction, and we therefore review for obvious error. *See State v. Lajoie*, 2017 ME 8, ¶ 13, 154 A.3d 132. For obvious error to exist there must be (1) an error, "(2) that is plain, (3) that affects substantial rights, and, if so, (4) that . . . seriously affects the integrity, fairness, or public reputation of judicial proceedings." *Id.* To determine whether there is an error, "we evaluate the instructions in their entirety" and consider their total effect, "the potential for juror misunderstanding, and whether the instructions informed the jury correctly and fairly in all necessary respects of the governing law." *Id.* ¶ 14 (quotation marks omitted).

### 1. Possession Instruction

[¶30] The court instructed the jury that "[a] person possesses something in the sense when they have custody over – custody or control over something for a period sufficient to become aware of their possession and to terminate that possession."[14] Rosario argues that the language "to terminate that possession" is not supported by legal authority and allowed the jury "to convict defendant even if they determined that the State had failed to disprove the

---

[14] Rosario concedes that "[p]ossession of a sufficient amount of fentanyl powder is essentially all the State must prove to establish trafficking" and that "aggravated trafficking may be established by mere possession of just a few grams more."

statutory defense" regarding Rosario terminating complicity as an accomplice under 17-A M.R.S. § 57(5)(C) (2022).[15]

[¶31] The court did not commit obvious error. Rosario was charged with aggravated trafficking in fentanyl powder in violation of 17-A M.R.S. § 1105-A(1)(M). At the time of the offense in 2019, "[t]raffick" was defined to include "C. To sell, barter, trade, exchange or otherwise furnish for consideration," "D. To possess with the intent to do any act mentioned in paragraph C," or "F. To possess 2 grams or more of fentanyl powder or 90 or more individual bags, folds, packages, envelopes or containers of any kind containing fentanyl powder." 17-A M.R.S. § 1101(17)(C)-(D), (F) (2018); *see also* P.L. 2015, ch. 346, § 1 (effective Oct. 15, 2015); P.L. 2021, ch. 396, § 1 (effective Oct. 18, 2021).[16] Thus, it was relevant whether Rosario possessed fentanyl powder.

---

[15] Title 17-A M.R.S. § 57(5)(C) (2022) states, "Unless otherwise expressly provided, a person is not an accomplice in a crime committed by another person if . . . [t]he person terminates complicity prior to the commission of the crime by: (1) Informing the person's accomplice that the person has abandoned the criminal activity; and (2) Leaving the scene of the prospective crime, if the person is present thereat."

[16] A 2021 amendment to 17-A M.R.S. § 1101(17) removed paragraph F. *See* P.L. 2021, ch. 396, § 1 (effective Oct. 18, 2021) (codified at 17-A M.R.S. § 1101(17) (2022)). Both at the time of the offense and now, the trafficking is "aggravated" if the person "violates section 1103" and "traffics in fentanyl powder in a quantity of 6 grams or more or 270 or more individual bags, folds, packages, envelopes or containers." 17-A M.R.S. § 1105-A(1)(M) (2022); *see also* 17-A M.R.S. §§ 1102(1)(I), 1103(1-A)(A) (2022); P.L. 2017, ch. 460, § F-3 (effective July 9, 2018).

[¶32] Possession is involuntary, however, if a person "[w]as not aware of the person's control of the possession for a sufficient period to have been able to terminate the person's possession of the thing." 17-A M.R.S. § 103-B(3)(B) (2022). The instruction regarding possession thus properly reflected the statutory language and was not in error. *See* Alexander, *Maine Jury Instruction Manual* §§ 6-41, 6-43 at 6-81, 6-84 (2022 ed. 2021). Rather than instructing, as Rosario contends, "that evidence that he terminated his possession was evidence of guilt," the instruction relates to the time necessary for voluntary possession to accrue and does not require a finding that Rosario did or did not terminate possession. Further, the court separately instructed the jury on the requirements of 17-A M.R.S. § 57(5)(C) regarding termination of complicity.

### 2. Specific Unanimity Instruction

[¶33] Rosario contends that the court erred in failing to give a specific unanimity instruction because the State argued that the crime was committed at multiple points, there were multiple legal theories upon which the jurors could determine Rosario was guilty, and the jurors "all had to agree on" a "discrete instance."

[¶34]  A specific unanimity instruction explains to jurors that they are required to unanimously agree that a single incident of the alleged crime occurred that supports "a finding of guilt on a given count." *Hodgdon v. State*, 2021 ME 22, ¶ 14 n.5, 249 A.3d 132.  Thus, we have said that upon request "the jury should be instructed" regarding specific unanimity "if the evidence offered in support of one charge includes more than one incident of the charged offense."  *State v. Hanscom*, 2016 ME 184, ¶¶ 10-12, 16, 152 A.3d 632 (quotation marks omitted) (determining that the court committed prejudicial error in failing to give a requested specific unanimity instruction where "the State presented evidence that [the defendant] committed the same crime against each victim on different occasions, and any one of those occasions could have led to a guilty verdict on that particular charge").

[¶35]  The court did not commit obvious error in failing to give a specific unanimity instruction.  The evidence does not suggest that Rosario committed multiple crimes on multiple occasions that could be the basis for a guilty verdict, but rather relates to a single, continuous, incident on December 18, 2019, to support a single count.  *Cf. State v. Elliott*, 2010 ME 3, ¶¶ 23, 25 n.11, 27, 987 A.2d 513.

### D. Sentencing

[¶36]  The day before the sentencing, Rosario submitted a sentencing memorandum stating that he is not a United States citizen, that he is subject to an immigration detainer, and that he will be deported following conclusion of his sentence.  Rosario argued that the appropriate sentence was fifteen years with all but four years suspended.  The State did not submit a written sentencing memorandum.  At the sentencing hearing on August 27, 2021, the State argued for a sentence of twenty-five years and a $25,000 fine, pointing to the seriousness of Rosario's conduct given the amount of fentanyl he possessed and arguing that there were aggravating factors including a prior conviction, his commercial motive, the out-of-state nature of the drugs, and his age and prior deportation.  Following an explanation of its sentencing analysis, the court sentenced Rosario to twenty-five years in prison, with ten years suspended and a four-year probationary period, and ordered him to pay a $25,000 fine.

[¶37]  Rosario contends that the court violated his due process rights by increasing the sentence based on factors that he was not notified about and that were not supported by a preponderance of the evidence.  Specifically, Rosario argues that the court relied on the fact that he was "here illegally," that he

possessed a second package of 900 grams of fentanyl that was not the basis for the verdict, and that his motive was commercial. Rosario also contends that there are no findings to support the fine and that to comport with the Eighth Amendment "there must be some basis . . . to determine that the fine imposed is not excessive."

[¶38] Because the Sentence Review Panel denied Rosario's application for leave to appeal from the sentence, this is a direct appeal and we review de novo "only the legality, and not the propriety, of the sentence." *State v. Dobbins*, 2019 ME 116, ¶ 51, 215 A.3d 769 (explaining that a direct appeal is confined to "a claim that the sentence is illegal, imposed in an illegal manner, or beyond the jurisdiction of the court, and the illegality appears plainly in the record" (quotation marks omitted)). A court has "wide discretion" regarding "the sources and types of information" it may rely on during sentencing, and is not limited to those facts found at trial but rather is "limited only by the due process requirement that such information [is] factually reliable and relevant." *State v. Bennett*, 2015 ME 46, ¶ 22, 114 A.3d 994 (quotation marks omitted).

[¶39] We conclude that there is no illegality in the sentence, for four reasons. First, there is no requirement for a presentence investigation and report or for the State to provide notice to Rosario of its arguments by filing a

sentencing memorandum. *See* M.R.U. Crim. P. 32(c)(1). Second, the court explicitly declined to rely on the first two factors to which Rosario assigns error in making its determination. The court stated that "at the time of these offenses, [Rosario's] immigration status was unknown," and it did not impose the sentence based on any alleged illegal status. The court also stated that "the trial only focused on – and a conviction was based only upon the smaller quantity of 111 grams," which the court deemed "a large amount," "significantly above the six grams to be a class A." Thus, the court did not rely on the second package, which allegedly contained over 900 grams of fentanyl powder, in addition to the package weighing approximately 111 grams.

[¶40] Third, the evidence at trial supports the court's statements that there were multiple packages and that Rosario's motive was commercial. *Cf. Bennett*, 2015 ME 46, ¶ 26, 114 A.3d 994. Finally, Rosario's counsel had the chance to, and did, refute the State's characterization of Rosario's immigration status, reference to the second package, and argument that Rosario was commercially motivated. *See id.* ¶ 28.

[¶41] Regarding the fine, the court stated the basis for both the term of imprisonment and the fine. Further, the fine is half of the maximum amount authorized by statute, 17-A M.R.S. § 1704(1) (2022), and is not

unconstitutionally excessive, *see Bennett*, 2015 ME 46, ¶ 15, 114 A.3d 994 ("[O]nly the most extreme punishment decided upon by the Legislature as appropriate for an offense could so offend or shock the collective conscience of the people of Maine as to be unconstitutionally disproportionate, or cruel and unusual." (quotation marks omitted)).

[¶42]  In short, we conclude that there is no illegality in the sentence or in the court's procedure.

## III.  CONCLUSION

[¶43]  Law enforcement had probable cause to stop the Kia and arrest its occupants, and the court therefore did not err in denying Rosario's motion to suppress.  Nor did the court err in determining that there was no violation of its sequestration instruction, in instructing the jury, or in sentencing Rosario.

The entry is:

> Judgment affirmed.

---

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Pedro J. Rosario

Todd R. Collins, District Attorney, and Matthew A. Hunter, Asst. Dist. Atty. (orally), 8th Prosecutorial District, Houlton, for appellee State of Maine