MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2026 ME 28
Docket:        Wal-25-77
Argued:        October 8, 2025
Decided:       March 19, 2026

Panel:         STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

STATE OF MAINE

v.

ALLEN JAMES JR.

STANFILL, C.J.

[¶1]  Allen James Jr.[1] appeals from a judgment of conviction and from a thirty-year carceral sentence for two counts of aggravated drug trafficking and one count of violating a condition of release entered by the trial court (Waldo County, *Larson, J.*) after a jury trial on the former and a guilty plea on the latter. James argues that (1) the court's jury instructions misstated the law of accomplice liability and (2) the court's determination of his basic sentence was both illegal and improper.  For the reasons explained below, we affirm the judgment of conviction, including the sentence imposed.

---

[1]  Neither the docket record nor the judgment and commitment include "Jr." in James's name, but we include it here because James is so named in the indictment.

## I. BACKGROUND

[¶2]  Based on the evidence admitted at trial, the jury rationally could have found the following facts beyond a reasonable doubt.  *See, e.g.*, *State v. Kilgore*, 2025 ME 81, ¶ 3, 345 A.3d 48.  Throughout the spring and summer of 2023, James and his girlfriend lived in a house they shared with the owner of the house and the owner's boyfriend.  James ran a sizable drug trafficking operation out of the house; he communicated with customers almost daily, and he regularly directed his housemates to help him conduct transactions.  On April 4, April 25, and July 5, 2023, a confidential informant working with the Maine Drug Enforcement Agency attempted to implicate James in a controlled purchase.  On each occasion, the informant communicated with James over the phone about acquiring drugs, went to the house, and acquired drugs, including methamphetamine and crack cocaine, from someone other than James.

[¶3]  On August 28, 2023, the State filed a criminal complaint charging James with a single count of aggravated drug trafficking (Class A), 17-A M.R.S. § 1105-A(1)(B)(1) (2025).  On January 26, 2024, the State filed a superseding indictment charging James with the following:

- Count 1: aggravated drug trafficking on or about April 4, 2023;

- Count 2: aggravated drug trafficking on or about April 25, 2023;

- Count 3: violating a condition of release (Class E), 15 M.R.S. § 1092(1)(A) (2025), on or about April 25, 2023;

- Count 4: aggravated drug trafficking on or about July 5, 2023;

- Count 5: aggravated drug trafficking on or between April 4 and August 27, 2023; and

- Count 6: conspiracy to commit aggravated drug trafficking (Class B), 17-A M.R.S. § 151(1)(B) (2025), on or between April 4 and August 27, 2023.

Other than Count 3, each of the counts alleged, as an aggravating factor, that James had prior convictions for drug trafficking. *See id.* § 1105-A(1)(B)(1). Count 5 also alleged that the trafficking was committed "pursuant to a scheme or course of conduct." *See* 17-A M.R.S. § 1106-A(1) (2025).[2]

[¶4]  In a chambers conference before the start of the trial, the State announced that it was "going to ask for an accomplice liability instruction." *See* 17-A M.R.S. § 57(3)(A) (2025).  James apparently made an objection, but his attorney's remarks were not transcribed due to "[a]udio interference."

[¶5]  The trial commenced on October 30, 2024.  At the opening of the proceedings, James stipulated that he had previously been convicted of felony

---

[2] Section 1106-A(1) provides that quantities of drugs may be aggregated when a defendant's drug trafficking is "committed pursuant to one scheme or course of conduct."  As we have explained, "Ordinarily, aggregation statutes are used to increase the sentencing classification, so that the aggregated charge has a higher sentencing classification than would each underlying charge prosecuted individually." *State v. Osborn*, 2023 ME 19, ¶ 29, 290 A.3d 558.

4

drug trafficking, and later that day he pleaded guilty to Count 3 (violating a condition of release).

[¶6]  In a chambers conference following the second day of the trial, the court informed the parties that it would, over James's objection, instruct the jury on accomplice liability:

> I have put in an accomplice instruction.  I know you had objected, [defense counsel], but I think it's been generated by the evidence . . . . [T]he only thing that's changed [is] that I added that instruction. Straight out of Alexander.[3]

The court also announced that it would not, as the State had suggested, give an instruction on whether James engaged in a "scheme or course of conduct":

> I'm not instructing on scheme or course of conduct. . . . [I]t really serves no purpose.  It's not like you're trying to aggregate drug amounts . . . to get an aggravated.  It's already aggravated because of the prior[ convictions].

Neither of the parties raised any further objections related to the accomplice-liability or course-of-conduct instructions, and when the court asked on the final day of the trial whether the parties were "all good with the instructions," James's attorney responded, "Yes."

[¶7]  Following the close of evidence on November 1, 2024, the court orally instructed the jury and provided it with a set of written instructions.  As

---

[3]  We understand the court to have been referencing Alexander, *Maine Jury Instruction Manual*, § 6-31 at 6-65 (2024 ed.).

relevant to James's claims on appeal, the court's instructions contained the following definitions of principal and accomplice liability:

> [A] person may be guilty of a crime in two different ways. A person may be guilty of a crime if he or she personally does the acts that constitute the crime, in which case the person is guilty of the crime as a principal. The second way in which a person can be guilty of a crime is as an accomplice to another person who actually commits the crime. A person may be found guilty of a crime as an accomplice if the State proves beyond a reasonable doubt that:
>
> (1) Having the intent of promoting or facilitating the commission of a crime,
>
> (2) The person solicits or aids or agrees to aid or attempts to aid another person who commits a crime in the planning or commission of that crime.

*See* Alexander, *Maine Jury Instruction Manual* § 6-31 at 6-65 (2024 ed.). The court also provided a more detailed instruction on accomplice liability. In its written instructions, the court stated:

> [O]nce a person's presence at a crime scene is proven, he may be guilty of the crime as an accomplice if he intentionally engaged in any conduct, however slight, that promotes or facilitates the commission of the crime.

*See id.* In its oral recitation of this instruction, the court appears to have misread a few words of the final clauses, stating that a person "may be guilty of the crime as an accomplice if he intentionally engaged in any conduct, however

6

slight, *or* promotes or facilitates the commission of the *conduct.*" (Emphases added.)

[¶8]  After instructing the jury on the general principles of accomplice liability, the court addressed the specific charges against James. For each of the charges other than conspiracy (that is, for Counts 1, 2, 4, and 5), the court described the requirements of unlawful trafficking with specific reference to the date(s) alleged in each count in the indictment. Finally, regarding the State's allegation that the conduct underlying Count 5 occurred "on or between April 4, 2023, and August 27, 2023," the court instructed the jury on the requirement of specific unanimity, stating that in order to return a guilty verdict, "all twelve of you must agree the State has proven all the required elements of trafficking with regard to at least one incident, and it must be the same incident for all of you." *See, e.g.*, *State v. Osborn*, 2023 ME 19, ¶¶ 13, 33-35, 290 A.3d 558.

[¶9]  The jury found James guilty on Counts 2 and 5 (trafficking on April 25 and on or between April 4 and August 27), acquitted him on Count 4 (trafficking on July 5), and could not reach agreement on Counts 1 and 6 (trafficking on April 4 and conspiracy to traffic on or between April 4 and August 27). The court, after inquiry, declared a mistrial on the latter two counts.

[¶10]  The court held a sentencing hearing on February 14, 2025.  The court merged Counts 2 and 5 and conducted a sentencing analysis on the merged Class A offense.  *See* 17-A M.R.S. § 1602(1) (2025).[4]  In determining James's basic sentence at step one of the analysis, the court "examine[d] . . . conduct that went on for an ongoing period of time from April 4, 2023, to August [27], 2023."[5]  The court found, by a preponderance of the evidence and with support in the record, that James "had a large business going on in Waldo County for a significant period of time" and that he regularly "used" his housemates to sell drugs for him "in order to shield his conduct."  Based on those findings, among others, the court set James's basic sentence "within the 18- to 21-year range."  The court then considered aggravating and mitigating factors and, emphasizing James's long history of prior convictions for drug offenses, set a maximum sentence at the statutory maximum of thirty years.  *See*

---

[4] Section 1602(1)(B) has since been amended. *See* P.L. 2025, ch. 402, § 1 (effective Sept. 24, 2025); P.L. 2025, ch. 420, § 1 (effective Sept. 24, 2025).

[5]  The court also noted, however, that it did not "factor [the July 5] transaction into its decision," because "the jury found [James] not guilty of the conduct on [that day]."  And with regard to the alleged transaction on April 4—charged in the one of the counts on which the jury was deadlocked—the court found only that James was "involved."

8

17-A M.R.S. § 1604(1)(A) (2025).  Finally, the court concluded that probation was not appropriate and set the final sentence at thirty years.[6]

[¶11]  James timely filed a notice of appeal from the judgment and an application for leave to appeal from the sentence.  *See* 15 M.R.S. §§ 2115, 2153 (2025); M.R. App. P. 2B(b)(1), 20(b).  The Sentence Review Panel granted James's application, and the sentence appeal automatically merged into his appeal from the conviction.  *See* 15 M.R.S. § 2152 (2025); M.R. App. P. 20(g)-(h).

## II.  DISCUSSION

### A.    The court's jury instructions were not plainly erroneous.

[¶12]  James argues that there were two related errors in the court's jury instructions.  First, he asserts that the court misrepresented the requirements of accomplice liability by defining its elements with reference to "a" crime in general rather than "the" crime committed by the principal.[7]  Second, he claims

---

[6] The court also imposed a $400 fine on the merged offense and sentenced James to six months of concurrent imprisonment on Count 3.

[7] Specifically, James argues that the italicized references to "a crime" in the following portion of the court's instructions should have been references to "the crime":

> A person may be found guilty of a crime as an accomplice if the State proves beyond a reasonable doubt that:
>
> (1) Having the intent of promoting or facilitating the commission of *a crime*,
>
> (2) The person solicits or aids or agrees to aid or attempts to aid another person who commits *a crime* in the planning or commission of that crime.

that the court compounded this error when it misread a few words of the instructions and stated that a defendant could be guilty as an accomplice if "he intentionally engaged in any conduct, however slight, or promotes or facilitates the commission of the conduct."[8]

[¶13]  Because James did not object at trial to the court's definition of accomplice liability or its oral misstatement, we review the court's instructions for obvious error.[9]  *See, e.g.*, *State v. Plummer* (*Plummer I*), 2020 ME 106, ¶ 14,

---

[8]  James acknowledges that "the court's written instructions . . . do not contain this inaccurate statement of law," but he suggests that the jurors may not have read the written instructions and asserts that "[e]ven if they did, a judge's spoken word, voiced solemnly in court, should take precedence."

[9]  James argues that his challenge to the court's definition of accomplice liability was preserved by virtue of an untranscribed objection related to the accomplice-liability instructions.  *See supra* ¶¶ 4, 6.  We disagree.  The discernable portions of the transcript strongly suggest that James objected only to the court giving an accomplice-liability instruction, not to any of the specific language in that instruction.  *Cf. Clewley v. Whitney*, 2002 ME 61, ¶ 9, 794 A.2d 87 ("Failure to direct the court's attention to the challenged language of its jury instructions or to offer a more acceptable version of a specific instruction renders any generalized objection inadequate to preserve the issue for appeal.").  And if James did, in fact, object to the language of the court's instruction in a portion of the proceedings that was not properly transcribed, it was his burden to correct or supplement the record on appeal.  *See, e.g.*, *Clark v. Heald*, 2009 ME 111, ¶ 2, 983 A.2d 406 ("[A]n appellant . . . has the burden and responsibility of providing us with an adequate record, including any transcript of the proceedings, that is sufficient to permit fair consideration of the issues on appeal."); M.R. App. P. 5(e) (providing that "the trial court may on motion or suggestion . . . supplement the record to correct [an] omission or misstatement"); *cf. In re Commitment of M.*, 2020 ME 99, ¶¶ 5, 17-18, 237 A.3d 190 (faulting a litigant for failing to take advantage of similar mechanisms to correct the record in an appeal from the District Court to the Superior Court).

James also asserts that we should treat this claim as preserved because the State conceded the point in its brief by quoting our description of the appellate standard of review for "a preserved challenge to jury instructions."  (Quoting *State v. Nightingale*, 2023 ME 71, ¶ 21, 304 A.3d 264).  But regardless whether this actually amounts to a concession on the State's part, our appellate standard of review cannot be controlled by the waiver or stipulation of the parties.  *See, e.g., Rush v. County of Aroostook*, 447 A.2d 478, 479 n.2 (Me. 1982); *United States v. U.S. Sugar Corp.*, 73 F.4th 197, 203 n.2 (3d Cir. 2023).

238 A.3d 241. "When reviewing for obvious error, we must determine whether there was (1) an error, (2) that is plain, and (3) that affects substantial rights. We will exercise our discretion to notice an unpreserved error only if we also conclude that (4) the error seriously affects the fairness and integrity or public reputation of the judicial proceedings." *Kilgore*, 2025 ME 81, ¶ 21, 345 A.3d 48 (alteration, omission, and quotation marks omitted).

[¶14] To determine whether a court's jury instructions were erroneous, we "evaluate the instructions in their entirety and consider their total effect, the potential for juror misunderstanding, and whether the instructions informed the jury correctly and fairly in all necessary respects of the governing law." *State v. Rosario*, 2022 ME 46, ¶ 29, 280 A.3d 199 (quotation marks omitted); *accord Plummer I*, 2020 ME 106, ¶ 15, 238 A.3d 241. An error in instructions is "plain" when the nature of the error is "so clear that the trial [court] and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *State v. Lajoie*, 2017 ME 8, ¶ 15, 154 A.3d 132 (quotation marks omitted).

[¶15] Our analysis of the court's jury instructions begins with a review of the relevant law. First, according to Maine's accomplice-liability statute,

> A person is an accomplice of another person in the commission of a crime if:

> With the intent of promoting or facilitating the commission of the crime, the person solicits such other person to commit the crime, or aids or agrees to aid or attempts to aid such other person in planning or committing the crime.

17-A M.R.S. § 57(3)(A). Thus, to find a person guilty of a crime as an accomplice, a jury must find that the person intended to promote, and engaged in conduct to promote, "the" specific offense committed by the principal.[10] *See, e.g.*, *State v. Chapman*, 2014 ME 69, ¶ 11, 92 A.3d 358; *State v. Perry*, 2006 ME 76, ¶¶ 22-24, 899 A.2d 806. Second, it is a "basic premise" of our criminal law that "the physical conduct [i.e., the actus reus] and the state of mind [i.e., the mens rea] must concur" with one another. 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.3(a) (3d ed.), Westlaw (database updated Oct. 2025) (citing *State v. Snow*, 383 A.2d 1385, 1388 (Me. 1978)). Thus, to find a mens rea element satisfied, a jury must find that "the defendant had the requisite [mental state] *when the criminal act was committed*." *State v. Graham*, 2015 ME 35, ¶ 28, 113 A.3d 1102 (emphasis added).

---

[10] The statute also provides that "[a] person is an accomplice under this subsection to any crime the commission of which was a reasonably foreseeable consequence of the person's conduct." 17-A M.R.S. § 57(3)(A). Under that provision, which is not relevant here, accomplice liability for a "secondary crime" attaches "when the alleged accomplice intends to promote [a] primary crime and the commission of the secondary crime is a foreseeable consequence of the accomplice's participation in the commission of the primary crime." *Plummer I*, 2020 ME 106, ¶ 26, 238 A.3d 241 (quotation marks omitted).

[¶16]   In James's view, the court's references to "a" crime rather than "the" crime and its oral misstatement of the instructions improperly allowed the jury to (1) find him guilty of drug trafficking based on evidence of his participation in criminal activity other than drug trafficking and (2) reach a "patchwork verdict" by taking "a mens rea element from the April 4 incident or from the July 5 incident or from the April 25 incident and combin[ing] it with the actus reus element from any one of the three."  The instructions did neither.

[¶17] First, it is not plausible that the court's stray references to "a" crime or the "conduct" led the jury to believe that it could find James guilty as an accomplice to drug trafficking based on evidence of some crime other than drug trafficking.  The court's instructions were replete with references to drug trafficking and did not mention any substantive crime other than drug trafficking.  Moreover, the totality of the court's instructions made clear that the only crime relevant to James's liability as an accomplice was "the crime" charged in the indictment and allegedly committed by James's housemates— drug trafficking. When introducing the concept of accomplice liability, the court explained that a person can be guilty of a crime either as a principal, "if he or she personally does the acts that constitute *the crime*," or "as an accomplice to another person who actually commits *the crime*." (Emphases added.)  The court

emphasized that the State must prove "each and every element of *the offense charged* beyond a reasonable doubt, regardless of whether the person acted as either a principal or as an accomplice." (Emphasis added.) And the remainder of the court's accomplice-liability instructions, both oral and written,[11] likewise defined the scope of accomplice liability with exclusive reference to "the crime" committed by the principal. In light of these clear indications that James's liability as an accomplice corresponded to "the crime" charged in the indictment, neither the court's misplaced references to "a" crime nor its oral misstatement created any ambiguity about the legal requirements of accomplice liability.[12] *See, e.g.*, *Plummer I*, 2020 ME 106, ¶¶ 17-23, 238 A.3d 241.

[¶18] Second, the court's instructions did not suggest to the jury that it could "reach a patchwork verdict" by taking "a mens rea element from the

---

[11] Because we review jury instructions as a whole, *see, e.g.*, *Rosario*, 2022 ME 46, ¶ 29, 280 A.3d 199; *Plummer I*, 2020 ME 106, ¶ 15, 238 A.3d 241, we reject James's suggestion to ignore the court's written accomplice-liability instruction and to analyze only the court's apparent misreading of that instruction when reciting it aloud, *see supra* ¶ 12 n.8. Instead, we assume that the jurors read the court's written instructions, just as we assume that the jurors listened to the court's oral instructions, and we consider both the written and oral instructions in our holistic review.

[12] James relies heavily on a line of Washington cases holding, "A trial judge errs by giving the jury an accomplice liability jury instruction that refers to the defendant's knowledge of '*a* crime,' rather than '*the* crime.'" *State v. Carter*, 109 P.3d 823, 825-26 (Wash. 2005). Even those cases, however, do not help James here. The Washington cases treat any such error as harmless when—as here—"the prosecution neither presents evidence of uncharged crimes nor argues that the jury may base accomplice liability on the defendant's knowledge of any crime other than the one charged." *Id.* at 829.

April 4 incident or from the July 5 incident or from the April 25 incident and combin[ing] it with the actus reus element from any one of the three." In its instruction for each of the individual drug trafficking charges, the court identified the date(s) alleged in the indictment as one of the "elements" that "the State must prove beyond a reasonable doubt." The court's instruction for Count 5 clearly expressed that "all twelve of you must agree the State has proven all the required elements of trafficking with regard to at least one incident, and it must be the same incident for all of you." In light of these instructions, we are satisfied that James's concerns of a "patchwork verdict" are unfounded.

[¶19] Although the court's jury instructions may have contained two imperfections, we review jury instructions as a whole, and a few isolated imperfections do not necessarily render a set of instructions erroneous. The instructions in this case, viewed in their entirety, accurately conveyed the legal requirements outlined above and made clear to the jury that it could find James guilty of drug trafficking as an accomplice only if it found that he intentionally aided another person in the commission of drug trafficking. *See, e.g.*, *Plummer I*, 2020 ME 106, ¶¶ 17-23, 238 A.3d 241 (rejecting a similar challenge to an accomplice-liability instruction). They therefore "informed the jury correctly

and fairly in all necessary respects of the governing law" and created no "potential for juror misunderstanding." *Rosario*, 2022 ME 46, ¶ 29, 280 A.3d 199 (quotation marks omitted); *accord Plummer I*, 2020 ME 106, ¶ 15, 238 A.3d 241. Although James is correct that it would have been more precise to define the elements of accomplice liability with reference to "the" crime rather than "a" crime and that the court misspoke when orally instructing the jury, neither of those isolated imperfections caused the jury to be misinformed about the law of accomplice liability. We conclude that there was no plain error.

**B.    The court's determination of James's basic sentence was neither illegal nor improper.**

[¶20]  In his sentence appeal, James claims that it was both unlawful and improper for the court to set his basic sentence based on conduct that was ongoing from April 4 to August 27, 2023. He argues that his basic sentence was unlawful because the court erred by considering the number of crimes committed at step one of its sentencing analysis rather than as an aggravating factor at step two. He also argues that his basic sentence was improper because even though the jury may have found that he was guilty of drug trafficking on only a single day—April 25—the court found, by a preponderance of the evidence, that he engaged in drug trafficking on other days between April 4 and August 27, and it considered that conduct in setting his basic sentence.

[¶21]　A trial court must follow the familiar three-step process in 17-A M.R.S. § 1602(1) to determine the length of a felony sentence. *See, e.g.*, *State v. Robshaw*, 2025 ME 50, ¶ 13, 339 A.3d 784. At step one—the only part of the analysis that James challenges—the court sets a basic sentence "by considering the particular nature and seriousness of the offense as committed by the individual." 17-A M.R.S. § 1602(1)(A). At step two, the court fixes a maximum sentence "by considering all other relevant sentencing factors, both aggravating and mitigating," including a list of specific factors provided by statute. *Id.* § 1602(1)(B). Finally, at step three, the court determines "what portion, if any, of the maximum term . . . should be suspended." *Id.* § 1602(1)(C). At each step of the analysis, the "court—rather than the jury—makes factual findings . . . by a preponderance of the evidence based on whatever information the court deems reliable." *State v. Carrillo*, 2021 ME 18, ¶ 42, 248 A.3d 193 (emphasis, omission, and quotation marks omitted).

[¶22]　Because James obtained leave to appeal from his sentence, we review the court's determination of his basic sentence for both legality and propriety. *See, e.g.*, *State v. Chase*, 2025 ME 90, ¶ 23, 345 A.3d 183. James's arguments are preserved, so we review "the sentencing court's determination of the basic sentence de novo for misapplication of legal principles," *State v.*

*Plummer* (*Plummer II*), 2020 ME 143, ¶ 10, 243 A.3d 1184 (quotation marks omitted), and we review the propriety of the basic sentence "for disregard of the relevant sentencing factors or abuse of the court's sentencing power," *Chase*, 2025 ME 90, ¶ 24, 345 A.3d 183 (quotation marks omitted); *see* 15 M.R.S. § 2155 (2025). We first address James's legal argument and then turn to his propriety argument.

[¶23] Relying on our decision in *State v. Downs*, 2007 ME 41, ¶¶ 12-13, 916 A.2d 210, James argues that the court misapplied the law by considering "the number of crimes committed" at step one of its sentencing analysis rather than as an aggravating factor at step two. We disagree. In *Downs*, the defendant pleaded guilty to seventy-six counts of burglary and theft based on thirty-eight separate occasions of criminal conduct. *See id.* ¶¶ 2-3. At sentencing, the court properly selected three counts as the representative offenses, but it erred by "consider[ing] the [total] number of crimes committed when setting the basic sentences" for the individual representative counts. *Id.* ¶ 12. Because the "number of other crimes committed" was "extrinsic to the particular nature and seriousness of [each] specific offense at issue," the fact that Downs had committed multiple offenses should have been considered at step two. *Id.* ¶¶ 12-13.

[¶24]  Here, unlike in *Downs*, none of the evidence the court considered at step one was "extrinsic to" the offense for which James was convicted. *Cf. id.* Indeed, because James was found guilty of trafficking as an *ongoing* offense, the number and nature of transactions that occurred throughout the duration of the offense were directly relevant to the "nature and seriousness of the specific offense at issue." *Cf. id.*  The jury found James guilty in Count 5 of drug trafficking on or between April 4, 2023, and August 27, 2023, and the court, in sentencing James on Counts 2 and 5, considered evidence that bore on the nature of James's drug trafficking throughout that period of time.  Because the court's determination of James's basic sentence did not rely on any evidence that was "extrinsic to" the ongoing offense for which James was convicted, the court did not misapply the legal principle we articulated in *Downs*.

[¶25]  Lastly, James argues that his basic sentence was improper because it was unfair: The jury was never tasked with determining whether he engaged in a "scheme or course of conduct," and may have found that he engaged in trafficking on only April 25, but the court nevertheless set his basic sentence based on a course of conduct spanning from April 4 to August 27.  In the circumstances of this case, we conclude that the court's sentencing was not improper.  First, James does not, and could not, challenge the court's decision

to not give the jury a "scheme or course of conduct" instruction; once James stipulated to his prior convictions, the court correctly concluded that such an instruction would be mere surplusage. *See supra* ¶¶ 3 n.2, 6; *Osborn*, 2023 ME 19, ¶¶ 26-29, 290 A.3d 558. And although James faults the State for failing to request special verdicts, there was nothing preventing James himself from moving to strike the surplus language from the indictment, *see* M.R.U. Crim. P. 7(d), or requesting special verdicts regarding the dates associated with the jury's findings, *see, e.g.*, *State v. Perkins*, 2019 ME 6, ¶ 11, 199 A.3d 1174; *State v. Gauthier*, 2007 ME 156, ¶ 24, 939 A.2d 77, *abrogated in part on other grounds by*, *Manley v. State*, 2015 ME 117, ¶ 18, 123 A.3d 219. Because James did not do so, however, the jury ultimately returned a verdict finding him guilty of drug trafficking on or between April 4, 2023, and August 27, 2023, and the court properly set James's basic sentence based on ample evidence of the "nature and seriousness" of that ongoing offense. *See* 17-A M.R.S. § 1602(1)(A).

[¶26] For these reasons, we conclude that the court's analysis of the basic sentence was neither illegal nor improper.

The entry is:

Judgment affirmed.[13]

---

[13] We note that the judgment and commitment and the docket record appear to contain clerical mistakes. Although the court clearly merged Counts 2 and 5 at the sentencing hearing and sentenced James on the merged offense, neither the judgment nor the docket record reflect the merger. Rather,

20

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Allen James Jr.

Aaron M. Frey, Attorney General, and Jeffrey Baroody, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Waldo County Unified Criminal Docket docket number CR-2023-525
FOR CLERK REFERENCE ONLY

they indicate that the court imposed a sentence of thirty years of imprisonment and a $400 fine on *each* of Count 2 and Count 5. On remand, the trial court should correct the records to accurately reflect that the counts were merged. *See* M.R.U. Crim. P. 50.